LYNCH ICHIDA THOMPSON & KIM
A Law Corporation

PAUL A. LYNCH 661-0
1132 Bishop Street, Suite 1405
Honolulu, Hawaii 96813
Telephone: 528-0100

Attorneys for Petitioner

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

DEC 07 2001

at 4 o'clock and 30 min. P.M.
WALTER A. Y. H. CHINN, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re the Application of: | ) Civil No. 00-00765 SPK LEK |
| | ) (Other Statutory Actions) |
| CATHERINE JANE | ) |
| VON KENNEL GAUDIN, | ) NOTICE OF HEARING OF PETITIONER'S |
| | ) MOTION TO VACATE ORDER DATED |
| Petitioner, | ) DECEMBER 11, 2000; PETITIONER'S |
| | ) MOTION TO VACATE ORDER DATED |
| vs. | ) DECEMBER 11, 2000; MEMORANDUM IN |
| | ) SUPPORT OF MOTION; EXHIBITS "C-3" |
| JOHN R. REMIS, JR., | ) TO "C-9" AND "P"; CERTIFICATE OF |
| | ) SERVICE |
| Respondent. | ) |
| | ) Hearing Date: February 22, 2002 |
| | ) Hearing Time:10:00 a.m. |
| | ) Judge: Honorable Samuel P. King |

NOTICE OF HEARING OF PETITIONER'S MOTION
TO VACATE ORDER DATED DECEMBER 11, 2000

TO:     Chunmay Chang, Esq.
        547 Halekauwila Street, #216
        Honolulu, Hawaii 96813
        Attorney for Respondent

NOTICE IS HEREBY GIVEN that the above-identified Petitioner's Motion to

Vacate Order dated December 11, 2000 shall come on for hearing before the Honorable Samuel

P. King, Judge of the above-entitled Court, in his courtroom in the United States Courthouse, 300

States Courthouse, 300 Ala Moana Boulevard, Honolulu, Hawaii, on Friday, the 22nd day of

February, 2002, at 10:00 o'clock, a.m., or as soon thereafter as counsel may be heard.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re the Application of: | ) Civil No. 00-00765 SPK LEK |
| | ) (Other Statutory Actions) |
| CATHERINE JANE | ) |
| VON KENNEL GAUDIN, | ) PETITIONER'S MOTION TO VACATE |
| | ) ORDER DATED DECEMBER 11, 2000 |
| Petitioner, | ) |
| | ) |
| vs. | ) |
| | ) |
| JOHN R. REMIS, JR., | ) |
| | ) |
| Respondent. | ) |
| | ) |

## PETITIONER'S MOTION TO VACATE
## ORDER DATED DECEMBER 11, 2000

Comes now Petitioner above named by and through her attorney, Lynch Ichida Thompson & Kim, and moves this Honorable Court for an order vacating the Court's earlier order dated December 11, 2000.

This motion is based on Rules 7 and 60(b)(1), (2), and (3) of the Federal Rules of Civil Procedure; specifically that newly discovered evidence and fraud, misrepresentation or misconduct of an adverse party, all discovered subsequent to the time in which to move for a new trial under Rule 59(b) had expired, mandates that vacation of the order dated December 11, 2000 is proper and appropriate in the circumstances. This motion is based upon the record in this matter, the memorandum in support of this motion, the exhibits attached hereto, and certain transcripts from the State of Hawaii proceedings.

DATED:     Honolulu, Hawaii, _____ .

DEC  7  2001

PAUL A. LYNCH
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| In re the Application of: | ) Civil No. 00-00765 SPK LEK |
| | ) (Other Statutory Actions) |
| CATHERINE JANE | ) |
| VON KENNEL GAUDIN, | ) MEMORANDUM IN SUPPORT OF |
| | ) MOTION;  EXHIBITS "C-3" TO "C-9" AND |
| Petitioner, | ) "P" |
| | ) |
| vs. | ) |
| | ) |
| JOHN R. REMIS, JR., | ) |
| | ) |
| Respondent. | ) |
| | ) |

MEMORANDUM IN SUPPORT OF MOTION

## TABLE OF CONTENTS

**I. Introduction**...........................................................................P.7

A) Application of the Hague Convention....................................P.7

B) Wrongful removal or retention............................................P.7

C) Grave Risk.......................................................................P.7

D) The decision relating to custody in the Family Court shall not be a grounds
for refusing to return a child under the Hague Convention.......................P.7

E) The non-return of the children to Canada under the Hague Convention  would
be an endorsement of the defendant's breach of the following laws and
principles.......................................................................................P.7

**II. Newly-discovered evidence and misrepresentations**...............................P10

**A) Newly discovered evidence and misrepresentations concerning:**.................P11

i) The August 30, 2000, Declaration of John R. Remis, Jr., in Opposition to
Motion to Decline Jurisdiction and Related Matters;

ii) The July 26, 2000 Declaration of John R. Remis, Jr., made in support of his
application for temporary restraining order and temporary change of custody,
originally filed in the Family Court;

iii) The videotape interviews of the children conducted by a social
worker in the State of Hawaii Department of Human Sevices,
Children's Advocacy Center (submitted by the Guardian Ad Litem);

iv) The August 30, 2000, affidavit of Dr. Sue A. Lehrke and Dr. Lehrke's
Letter of November 17, 2000;

v) The November 20, 2000, Report of the Custody Guardian Ad Litem,
Marianata Lopez, Esq.,.

2

1)The newly discovered evidence in Family Court showed that the allegation of defendant in those Declaration was not accurate and was misleading. It also explains the reasons for the children's behavior at the videotape interview........P.11

    1)  Dr. Lehrke describes the parental alienation syndrome, as follows:.....................................................................P.13

    2)  Dr. Lehrke, when she interviewed the children, made no investigation that the defendant had said negative things about his children's Mother...........................................P.14

    3)  Dr. Lehrke had a concern about whether the children were being significantly alienated from their Mother.............P.14

    4)  Defendant never encourages or prepares the children for their return to their Mother after visitation...........................P.15

    5)  Defendant never agreed with the religious belief and practice of the Plaintiff and did inform the children about his disagreement.....................................................P.15

    6)  The Defendant in a conflicting situation with Plaintiff did not support his children communicating with their Mother............................................................P.16

    7)  The Defendant, in the presence of the children, conveys negative attitude about their Mother ............................P.16

    8)  Troubling statements are made by the children while being interviewed by the C.P.S., that show signs of influence from an adult leading to parental alienation.........................P.18

    9)  Dr. Lerhke would not give any opinion about custody and visitation, even after reading the Custody Guardian Ad Litem report...........................................................P.19

    10) The Defendant admitted that he would have returned the children to Plaintiff if she had renounced the home schooling of the children ...................................................P.20

    11) Plaintiff is a good mother acting in the best interest of the children and the Defendant decided unilaterally to alienate the children from her.....................................................P.21

12) Since 1994 plaintiff has always encouraged  the relationship
    of the children with the Defendant.....................................P.23

13) The Plaintiff invites the defendant into her house before his
    departure with the children.............................................P.24

14) The Plaintiff consents to the summer activities choices
    of the defendant for the children and never interferes..............P.24

15) Since 1998 the Plaintiff has even consented to help the
    Defendant do some activities (Halloween) with the children
    some of which she doesn't approve.....................................P.24

16) The Plaintiff respected and never interfered in the way
    Defendant was exercising his visiting rights.........................P.25

17) The Plaintiff yielded to the Defendant's requirement for
    her relocation, even though it was distant from her family, but
    closer to the Defendant's family......................................P.25

18) The Plaintiff encourages communication between
    the children and the Defendant and respects their schedule........P.25

19) The Plaintiff keeps the Defendant informed of any subject
    regarding the children as required by the 1994
    stipulated judgment....................................................P.26

        i)For the children's education she communicated
        the school reports and consulted the Defendant for his
        opinion on home schooling by sending the following
        letter:..............................................................P.26

        ii) For Johnny's shortness of breath and chest pains
        she informed the Defendant and went to see a Doctor..........P.27

20) The Plaintiff sees to it that the children remember their
    Father's birthdays....................................................P.28

21) Defendant has had physical custody of the children for the
    Last 7 months resulting in parental alienation from
    their Mother..........................................................P.29

22) The Plaintiff is very flexible, which is a appropriate quality
    for the custodial parent, as shown by the following events........P.29

4

**2) This Court was misled by the evidence produced as exhibits by the Defendant in the Federal Court proceeding**.........................................P.30

    a) The July 26, 2000 Defendant's declaration supporting the ex parte motion...................................................................P.30

    b) The August 30, 2000, affidavit of Dr. Sue A. Lehrke And Dr. Lehrke's letter of November 17, 2000..............................P.34

**3) This Court was not informed that Dr. Lehrke's Letters and Affidavit, were in fact and in law incompetent under the mandatory requirements of the American Psychological Association Ethics Code**............................P.37

    a) Dr. Lehrke's Letters, Affidavit, and testimony are incompetent and irrelevant and should not be given any weight by this Court ...............P.37

    i) Dr. Lehrke performed forensic functions for John Remis in this case and did so in direct violation of the mandatory rules of ethics for psychologists in such case, and then deliberately mislead the Court under oath...............................................................................P.38

**4) The Defendant never disclosed to this Court that his objective was to petition the Hawaii Family Court only for a more convenient forum for himself and for his solely personal and economic concerns**:.....................P.45

    i) The Defendant engaged in an abuse of process in order to obtain a more convenient forum.......................................................P.47

    ii) Complication of procedures for the Plaintiff because of the Defendant's action............................................................P.49

**5) The November 20, 2000, Report of the Custody Guardian Ad Litem, Marinita Lopez, Esq.,**..................................................................P.51

    a) The Custody Guardian Ad Litem report should not be considered by this Court as evidence to determine the "grave risk" issue for the following reasons....................................................................................P.51

        i)The Custody Guardian Ad Litem is an attorney for the children and is bound by the Hawaii rules of professional condu...............P.51

        ii) In this case the Custody Guardian Ad Litem is an attorney to a child in a custody case....................................................P.52

iii) The Custody Guardian Ad Litem has based her recommendation on Dr. Lehrke's report which Dr. Lehrke admits cannot be relied upon...................................................................................P.53

iv) The Custody Guardian Ad Litem has no psychological expertise, nor did she obtain consultation from an expert other than Dr. Lerhke for her report and testimony.......................................P.54

v) The only other evidence that the Custody Guardian Ad Litem could rely on is the version of her clients (the children) and the Defendant, which is not sufficient evidence because both may have a biased position against Plaintiff and in any event there is no valid psychological expertise to evaluate this family and the truth...............................................................................P.54

vi) The report of the Custody Guardian Ad Litem is biased, incomplete, contains hearsay and relies on no valid expertise of any kind at all.................................................................P.55

**III. Conclusion** .................................................................P.57

A) The non-return of the children to Canada under the Hague Convention would be an endorsement of the Defendant's breach of the following laws and principles...........................................................P.57

1.) The Hague Convention article 3 (Exhibit A);

2.) The Canadian court decision on August 22, 2000 (Exhibit C-1)';

3.) The Canadian court decision on November 23, 2000 (Exhibit C-2);

4.) The finding of Judge King's decision on the following matter;

5.) The International Child Abduction Remedies Act (ICARA) 42 USC 11601 sec 2  A (2) (Exhibit B);

6.) The Hawaii 1994 stipulated judgment;

7.) The abuse of process of the family court rules on special proceedings (*ex parte* motion); and

8.) The jurisprudential outline by the United States court of appeals for the sixth circuit in its decisions re  Friedrich vs Friedrich, which is the leading case on the Hague Convention in the United States that includes the following principles.

# I. INTRODUCTION

## A) Application of the Hague convention

The Hague Convention (Exhibit A) is an international law that provides in its preamble that:

> "the states signatory to the present convention are firmly convinced that <u>the interests of children are of paramount importance in matters relating to their custody, desiring to protect children internationally from the harmful effects of their wrongful removal or retention</u> and to establish procedures to ensure their prompt return to the State of their <u>habitual residence</u>, as well as to secure protection for rights of access, have resolved to conclude a convention to this effect, and have agreed upon the following provisions..." (Emphasis added).

The International Child Abduction Remedies Act (Exhibit B) 42 USC 11601 et seq. (ICARA) implements the Hague Convention in the United States of America.

## B) Wrongful Removal or Retention:

On November 23, 2000 the Canadian Court, after considering all the evidence filed in the Hawaii Court, rendered a judgment acknowledging that the children have been the object of an international abduction (wrongful removal or retention) according to articles 3 and 5 of the Hague Convention (Exhibit C-2).

This Court came to the conclusion that "Petitioner has established as a threshold matter that retention of the children by respondent was 'wrongful' for purposes of ICARA and the Hague Convention." (Order p.11).

## C) Grave Risk

Under the criteria of the Hague convention whether there is a grave risk must first be determined because if there is <u>not</u> a grave risk the issue of custody must be decided in Canada.

The burden of proof of the existence of grave risk (clear and convincing evidence) is

7

much greater than the preponderance of evidence.

We submit that in light of the newly discovered evidence heard and produced in

Family Court that the burden of proof for "grave risk" has <u>not</u> been met and therefore

"grave risk" does <u>not</u> exist in this case.

**D) The decision relating to custody in the Family Court shall not be a grounds for refusing to return a child under the Hague Convention.**

Article 17 of the Hague Convention provides:

> "The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State <u>shall **not** be a grounds for refusing to return a child under this Convention</u>, but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention. (Art. 17  Exhibit A) (Emphasis added).

**E) The non-return of the children to Canada under the Hague Convention would be an endorsement of the Defendant's breach of the following laws and principles:**

1.) The Hague Convention article 3 (Exhibit A):

> "The removal or the retention of a child <u>is to be considered wrongful where</u>
>
> a) it is in breach of right of custody attributed to a person...."(Emphasis added).

2.) The Canadian court decision on August 22, 2000 (Exhibit C-1).

3.) The Canadian court decision on November 23, 2000 (Exhibit C-2):

> "We acknowledge that the child, Andreas Wailani Remis, born on June 23, 1992 and the child John Anolani Remis, born on September 17, 1990 <u>have been the object of an international abduction (wrongful removal or retention)</u>... according to the article 3 and 5 of the Hague Convention on the civil aspects of international child abduction." (Emphasis added).

4.) The finding of Judge King's decision on the following matter:

> "Petitioner has established as a threshold matter that <u>retention of the children by Respondent was "wrongful"</u> for purposes of ICARA and the Hague Convention" (Order p.11) (Emphasis added).

8

5.) The International Child Abduction Remedies Act (ICARA) 42 USC 11601 sec 2 A (2) (Exhibit B):

> "Persons should not be permitted to obtain custody of children **by virtue of** their wrongful removal or retention." (Emphasis added).

6.)  The Hawaii 1994 stipulated judgment:

> "…and furthermore on all matters concerning this judgment, any decision would be subject to the determination of a court of competent jurisdiction in the country in which the Mother and the child are residing…" (Exhibit E-1 and E-2 , p.7 article 6) (Emphasis added)

> " A. Relocation: The father hereby consents to the relocation of the mother with the child to Canada." (Exhibit E-1 and E-2, p.2 article 2) (Emphasis added).

7.)  The abuse of process of the Family Court rules on special proceedings (ex parte motion):

> HFCR Rule 65 (b) " - - - when it clearly appears from specific facts shown by affidavit or by the verified complaint or cross-complaint that immediate relief to the applicant is appropriate. - - -." (Emphasis added).

8.)  The jurisprudential outline by the United States court of appeals for the  sixth circuit in its  decisions re  Friedrich vs Friedrich, which is the leading case on the Hague Convention in the United States that includes the following principles:

a) Concerning the grave risk exception:

> "All four of these exceptions are 'narrow'_42 U.S.C. 11601 (A) (4). They are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute." (p.5 Exhibit P ); (Emphasis added)

b)  Concerning custody matters:

> "The exception for grave harm to the child is not a  license for a court in the abducted-to country to speculate on where the child would be happiest.  That decision is a custody matter and reserved to the court in the country of habitual residence (p.6 Exhibit P) (Emphasis added).

c)  Concerning the ability of  a foreign court:

> "In thinking about these problems, we acknowledge that courts in the abducted from country are as ready and able as we are to protect children;  if return to a country or to the custody of a parent in that country is dangerous, we can expect that country's courts to respond accordingly." (p.6 Exhibit P )(Emphasis added).

9

d) Concerning "grave risk":

"...we believe that a grave risk of harm for the purpose of the convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute e.g., returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." (p.7 Exhibit P )(Emphasis added).

On December 11, 2000 this Court denied the petition for return of children to petitioner pursuant to 42 U.S.C 11601 ET SEQ (the International Child Abduction Remedies Act). The trial in State Family Court began the next day December 12, 2000. During this trial petitioner discovered new evidence that mandates a change in the decision of this Court on the petition for the return of her children.

## II. NEWLY-DISCOVERED EVIDENCE AND MISREPRESENTATIONS

In the December 11, 2000 order, this Court stated:

"...respondent has met his burden of demonstrating by clear and convincing evidence that the children would be subject to a grave risk of psychological harm if they were returned to their mother at this time. This finding is based on evidence that at least some harm was occurring or had occurred before the children returned to Hawaii (sic). In particular, the Court credits (1) the November 20, 2000, Report of the Custody Guardian Ad Litem, Marianita Lopez, Esq., (2) the August 30, 2000, affidavit of Dr. Sue A. Lehrke, (3) Dr. Lehrke's letter of November 17, 2000, (4) the August 30, 2000, Declaration of John R.Remis, Jr., in Opposition to Motion to Decline Jurisdiction and Related Matters, originally filed in the Family Court, (5) the July 26, 2000, Declaration of John R. Remis, Jr., made in support of his application for temporary restraining order and temporary change of custody, originally filed in the family Court, and (6) a videotape of interviews of the children conducted by a social worker in the State of Hawaii Departement of Human Services, Children Advocacy Center (submitted by the Guardian Ad Litem). The Court has also taken into account the findings and reasons stated in the September 25, 2000, order of the Family Court modifying its

10

July 27, 1994, judgments (the order granting temporary custody to Respondent and finding grave risk to the children if they are returned to Petitioner)."
(p.12, Order denying petition for return of the children to petitioner, December 11, 200) (Emphasis added).

As we will demonstrate in the following arguments, the Family Court trial held in this case has revealed new evidence that directly contradicts what was disclosed to this Court when the petition for return of child pursuant to 42 U.S.C 11601 ET SEQ (the International Child Abduction Remedies Act) was heard on December 8, 2000. This evidence also shows that some of the documentary evidence produced before this Court was misleading and inaccurate.

**A) Newly discovered evidence and misrepresentations concerning:**

> i) The August 30, 2000, Declaration of John R. Remis, jr., in Opposition to Motion to Decline Jurisdiction and Related Matters;
>
> ii) The July 26, 2000 Declaration of John R. Remis, jr., made in support of his application for temporary restraining order and temporary change of custody, originally filed in the Family Court;
>
> iii) The videotape of interviews of the children conducted by a social worker in the State of Hawaii Department of Human Sevices, Children's Advocacy Center (submitted by the Guardian Ad Litem).
>
> iv) The August 30, 2000, affidavit of Dr. Sue A. Lehrke and Dr. Lehrke's Letter of November 17, 2000;
>
> v) The November 20, 2000, Report of the Custody Guardian Ad Litem, Marianata Lopez, Esq.,.

**1) The newly discovered evidence in Family Court showed that the allegations of defendant in those Declaration were not accurate and were misleading, it also explains the reasons for the children's behavior at the videotape interview.**

The Defendant alleges that there is a grave risk, but the facts show otherwise.

The Defendant uses the differences in parenting the children between himself and the

Plaintiff as grounds for asserting a "grave risk". The difference in parenting is a healthy situation for children who can compare and benefit from two different parents in character, behaviour and parenting skill. The only negative effect is that the Defendant, instead of confirming the parental authority of the Plaintiff (Mother) over the children, did in fact get involved in discrediting Plaintiff's (Mother's) behavior and parenting skills on many occasions in front of the children. That attitude has been going on for at least the past two years, as demonstrated by Defendant's first visit to Dr.Lehrke's office in the summer of 1999.

The purpose of the first visit to Dr. Lehrke came about because of the following alleged report of the children to the Defendant:

Unhappiness, stuttering, Bible work, the way their Mother was treating them, the soup, absence of socialization, no sports, doing nothing outside of the house and they did not want to go back with the Mother.

> "Q. What was your purpose in going there in 1999?" (p.25, line 12, Remis Transcript, December 14, 2000).

> "The Witness: the guys were unhappy. Johnny had been stuttering. They had been complaining about the Bible work. They were complaining about the way their mother treated them and they…complained about something about the soup, that she couldn't…something about…they didn't like some kinda soup and had to eat it again.
> They basically didn't wanna go back. They didn't …they have always expressed that they don't wanna go back and not just at the end of the summer. It goes throughout the summer that they don't wanna go home.
> And so I was concerned about their absence of socialization because the all…the other issue that was….was that Catherine was no longer doing anything with them in terms of sports…that Catherine was no longer doing anything with them outside of the house. (p.25, lines 18 to 25 and p.26, lines 1 to 7, Remis Transcript, December 14, 2000) (Emphasis added).

The opinion of Dr. Lehrke at that time was that the children were healthily rejecting whatever the circumstances were:

> "A. Because the psychologist told me that there was <u>no reason for concern</u>, that the <u>boys were healthily</u> rejecting whatever the circumstances were." (p.67, lines 15 to 17, Remis Transcript, December 13, 2000) (Emphasis added).

The Defendant instead of supporting the Mother in front of the children, openly showed to the children that he did not agree with their Mother's behavior and parenting skills. This initiated the process of the children's alienation from their Mother by Defendant.

Defendant on many occasions influenced the children by his words and behavior in order to show them <u>(consciously or not)</u> that he disapproved of their Mother's behavior and parenting skills.

We will try to describe through statements of the Defendant what we feel is only the tip of the iceberg of the parental alienation here, because it is the <u>only evidence available</u> in that no professional family expertise has been utilized to assess and evaluate this family. (Defendant objected to the Plaintiff's proposal at the beginning of the Family Court trial to have a psychological family evaluation by an independent psychologist).

## 1) Dr. Lehrke describes the parental alienation syndrome, as follows:

> " - - But - - but the concept is that some parents either overtly create a poise (sic- poisonous ?) of attitude in children toward their other parent, and some parents, <u>through more subtle means</u>, like body language and facial expression and tone of voice, um, <u>convey negative attitudes</u> towards the other parent to the child and essentially <u>alienate the child from the other parent</u>.
>
> And then parental alienation syndrome is applied when the <u>child seems to have completely rejected the other parent</u>, um, because of the parent's - - one parent's alienating activities." (p. 20, lines 15 to 25, Lehrke Transcript, December 19, 2000).

13

"A. Um, well, the other - - one other thing that is sometimes considered a sign of that is if the <u>children can express no positive feelings towards a parent</u>.

And <u>that actually is present in this case</u>, - - ." (p.21, lines 10 to 13, Lehrke Transcript, December 19, 2000).
(Emphasis added).

" But I do – I have clinically experienced that some parents seem to actually very actively <u>poison their children's minds against the other parent</u>" (p.73 lines 1 to 3 Lehrke Transcript, December 19, 2000).(Emphasis added).

**<u>₂) Dr. Lehrke, when she interviewed the children, made no investigation to determine if the defendant had said negative things about his children's Mother:</u>**

"Q. Do you have a sense whether when he said that to you that that was in any way influenced by Mr. Remis ?

A. That's a possibility that I raised with the custody guardian ad litem because Mr. Remis is an attorney and he's familiar with family court issues. And so I talked to her about the possibility that he had coached the children or encouraged them to do so some sort of an acting job when they were seen by me.

But I didn't have any evidence that the children were parroting rehearsed statements and I <u>didn't have any evidence that he had said negative things about their mother or encouraged them to have negative attitudes towards her.</u>" (p.18 lines 7 to 18,  Lehrke Transcript, December 19, 2000). (Emphasis added).

" - - What I was looking for was whether there was anything I could find out from the boys that would indicate that father was creating the alienating feelings that they were having towards their mother.

Q. And at this point, are you in a position to tell the Court <u>whether you found anything on Mr. Remis' part to cause this alienation from the mother?</u>

A. I didn't find anything, <u>but that's not conclusive because really I did not do an investigation."</u> (p.23 lines 4 to 12, Lehrkes Transcript, December 19, 2000).
(Emphasis added).

**<u>₃) Dr. Lehrke had a concern about whether the children were being significantly alienated from their Mother:</u>**

" A. Um, well, the other - - one other thing that is sometimes considered a sign of that is if the <u>children can express no positive feelings towards a parent</u>.

And <u>that actually is present in this case</u>, in - - in John, Jr. he - - he – when I press him, he can't give me any negative (sic) perceptions of his mother.

14

Andreas can say maybe she's okay in some ways, although he couldn't come up with anything much specific either.

So that is a concern about whether the children are being significantly alienated from their mother." ( p.21, lines 19 to 20, Lehrke Transcript, December 19, 2000) (Emphasis added).

**4) Defendant never encourages or prepares the children for their return to their Mother after visitation:**

"...The...of course the boys were in tears, and I think Catherine met us there and the separation was traumatic, as they always are..." (p. 13, lines 1 to 3, Remis Transcript, December 12, 2000) (Emphasis added).

**5) Defendant never agreed with the religious belief and practice of the Plaintiff and did inform the children about his disagreement:**

The Defendant's view of religion seems very negative when he states:

"...the human experience suggests that religion is the basis for unfortunate problems in the world, and there are many people who go overboard." (p.66, lines 23 to 25, Remis Transcript, December 13, 2000).(Emphasis added).

This translates to a difference between him and the Plaintiff on the place and practice of

religion in the life of an individual and the family including the lives of their children.

The Defendant did attend the Plaintiff's Church once and stated:

"...so I was there for the whole time, and it was oppressive to me. Not to the religion, but for the time..." (p. 70, lines 9 and 10, Remis Transcript, Dec 13, 2000). (Emphasis added).

The manner in which the Defendant expressed to his children his feelings about the

Plaintiff's Church was in derogation of the Mother's religious practices:

"Q. Okay and did you express to the boys that you were tired?

A. Probably. I said,you know, let's get out of here." (pg. 71, lines 3 to 6 Remis Transcript, Dec 13, 2000) (Emphasis added).

"Q. And you sympathized with them and you wanted to assist them to go home, right?

A. No. I knew that we were there until Catherine was able to leave.

Q. Okay.

A. And…and…so

Q. But you sympathized with them about you're tired so you can understand how they're tired, and…

A. Sympathized with them because they were tired and they…

Q. Right.

A. …were anxious to get outside and play.

Q. Right, and…and <u>you let them know that you sympathized with their feelings.</u>

A. <u>Of course.</u> (p.72, lines 1 to 15, Remis Transcript, December 13, 2000). (Emphasis added).

**6) The Defendant, in a conflicting situation with Plaintiff did not support his children in communicating with their Mother :**

"….and I told them, it's your Mother. You gotta be polite, but <u>I'm not gonna tell you what to do</u>…" (p.30, lines 11 and 12, Remis Transcript, December 13, 2000).

"Q. Okay and, you know, a little bit earlier here this morning you testified that in their phone calls to their Mother you told them that they needed to be polite but you weren't gonna tell them what to say or do. Is that correct?

A. Yeah, <u>I wasn't gonna order them to do something'.</u>" (p.72, line 16 to 21, Remis Transcript December 13, 2000) (Emphasis added).

**7) The Defendant, in the presence of the children, conveys negative attitudes about their Mother:**

Q. Since you've had the boys from June 9th, how have they maintained contact with Miss Gaudin, their Mother?

A. Yes, Basically, the arrangement has always been that we would make the phone calls to their Mother, and we did that. And then <u>with all that has been thrown at us,</u> if you will, <u>I said, you know what, let her call us</u>…" (p.29, lines 10 to 16, Remis Transcript December 13, 2000). (Emphasis added).

Defendant, when he called Plaintiff for the immunization records required by the school

in Hawai'i, chose to do so in the presence of the children, which demonstrates how

much he has them involved in the proceedings:

> "A. I called before the guys…what, August 23rd was their first school day at
> Pauoa Elementary. I had made the request for this information ..Well…probably
> two weeks in advance of that. I went to the school and picked up the enrollment
> package and whatever it was, and this was part of it, and so I said I need this stuff.
> And it was a dead end." (p 44, lines 7 to 14, Remis Transcript, December 13,
> 2000) (Emphasis added).

The same as to the visit of the police officers, which should not have been any concern

of the children, but the Defendant chose to inform them of the purpose of the visit :

> "…and I told them, there's an investigation and everything was okay…." (p.22,
> lines 8 and 9, Remis Transcript, December 13, 2000).

> "Q. Has it become aware to you that the boys have made the connection that they
> thought it was their Mother?

> A. They asked her **why** she called the police on them. **Why are you callin' the
> cops on us** or **why** are you callin' the police on us" (p. 133, lines 9 to 13,
> Remis Transcript December 13, 2000, 9 to 13).
> (Emphasis added).

This led to the children confronting their Mother with that issue on the telephone:

> " A. They – um - - they told me that they knew that their mother had something to
> do with this because one of them had confronted her about it on the phone and she
> had admitted it." (p.51,lines 9 to 12, Lehrke Transcript, December 19, 2000).
> (Emphasis added).

And Defendant made derogatory comments after the intervention of the C.P.S.:

> "And I said, Well, you know, whatever this is, that you just have to…we just have
> to participate in this. This is what happens when cases like this go on.(p.23, lines
> 5 to 7, Remis Transcript, December 13, 2000). (Emphasis added).

About those incidents  (Police and C.P.S.) the Defendant told the children that allegations

had been made against him, which did cause the children to be very upset against their

Mother:

17

"Q. And that's three months later. And <u>what was the occasion for seeing them on</u> November 10th, given what you just testified to ?

A. Um, Mr. Remis called because they were again <u>quite upset</u> and that because they had been interviewed <u>related to allegations against him</u>.

Q. I'm sorry. Would you repeat the last part of that answer ?

A. They were being interviewed <u>related to allegations against Mr. Remis by their mother</u>, and Mr.Remis felt that <u>they were again very upset</u>, kind of acutely upset, and so he felt they needed to be seen. ( P. 48, lines 6 to 17,  Lehrke  Transcript, December 19, 2000) (Emphasis added).

**8) Troubling statements are made by the children while being interviewed by the C.P.S., that show signs of influence from an adult leading to parental alienation:**

- Andreas said regarding Kanani:

    "We don't see Kanani anymore because <u>she is on Mother's side</u>" (see videotape). (Emphasis added).

This expression comes obviously from the influence of an adult.

- Andreas said regarding the Church of their Mother, which they have attended for

    the past six years:

    "<u>it's a weird Church</u>" (see videotape)  (Emphasis added).

This expression comes obviously from an adult.

- Andreas when questioned about his Mother said:

    "What do you like about Mom?

    <u>Nothing.</u>"(see videotape). (Emphasis added).

This statement shows a typical symptom of parental alienation syndrome.

- Johnny said among other things when criticizing his mother's house:

    " <u>She doesn't have a fire alarm".</u> (see videotape).

This observation does not likely come from a ten-year-old boy but from the influence of

an adult.

**9) Dr. Lehrke would not give any opinion about custody and visitation, even after reading the Custody Guardian Ad Litem report:**

Q. (BY MR. LYNCH) Doctor, this is a letter that you sent to Chun May Chang, Esquire, and myself, December 15th, which I guess last Friday, and you were telling us about your availability today to testify by telephone. And you state that you will not state expert opinions 'cause that's the role of the custody guardian ad litem.

And my question is, this is something that you indicated in your earlier testimony that you had told Mr. Remis all along; correct?

A. That's right.

Q. And is there any particular reason then why you're reiterating it in this letter?

A. I think I'm reiterating it to kind of, um, reiterate it to May Chang that - - that I intend to defer to the custody guardian ad litem regarding opinions about custody and visitation.

Q. Okay. Do you know if the custody guardian ad litem has psychological training?

A. No.

Q. But you felt that the custody guardian ad litem seems to have - - you've read her report, I take it?

A. I've read her first report. I don't know if there were any other reports.

Q. No, there are not, that - - that I'm aware of. The - - you feel that your testimony will --you doubt that it'll shed new light because she seems to have obtained all the same information independently from the same sources.

Do you see that?

A. Yes.

Q. Okay. And do I take it then, the bottom line for you when you wrote this letter is you don't understand really why anybody needs you to testify at all?

A. That's right. (p.44, lines 17 to 25; p. 45, lines 1 to 25, Lehrke Transcript, December 19, 2000).
(Emphasis added).

19

**10) The Defendant admitted that he would have returned the children to Plaintiff if she had renounced the home schooling of the children:**

> " Q. Well, would you agree with me that what you were offering her was I've got a problem with your home schooling. If you'll give up the home schooling - - if you don't give up the home schooling, then <u>I'm gonna attempt to get custody of the boys. If you give up the home schooling I won't.</u>
>
> Is that what it's - -
>
> A. <u>Yeah, that's - - that's the black and white.</u>" (p.187 lines 18 to 25, Remis Transcript, December 13, 2000).
> (Emphasis added).

This statement puts the lie to the Defendant's purported concern that he be given custody because of his sons allegedly "much much much worse" condition observed when he picked them up on June 9, 2000.

The defendant's position on home schooling has been totally unjustified because of his total ignorance about it :

> " Q. Okay. Now do you have a problem with the content of the curriculum in the home school program?"
>
> A. I don't know its content (p.121, lines 20 to 22, Remis Transcript, December 13, 2000).
>
> " The Witness: <u>I don't know anything about Bob Jones</u> and <u>I don't have an opinion</u> about it as - - an appropriate forum for home schooling or format for home schooling. So I - - <u>my objection is more generic.</u>" (p 122 lines 22 to 25 Remis Transcript, December 13, 2000).
> (Emphasis added).

Home schooling is a legally approved method of education in the province of Quebec, Canada, which is the habitual residence of the children for the past 6 years:

> Quebec Education Act, article 15 (4):
>
> " 15. The following students are exempt from compulsory school attendance:

20

(4) a student who receives home schooling and benefits from an educational experience which, <u>according to an evaluation made by or for the school board, are equivalent to what is provided at school</u>."(Exhibit C-3 p.5) (Emphasis added).

## <u>11) Plaintiff is a good Mother acting in the best interest of the children and the Defendant decided unilaterally to alienate the children from her.</u>

Children need a normal relationship with their parents. The best interest of the children requires a balance of healthy relations with both parents notwithstanding the differences that could exist in the parents' behavior, character or parenting when they are in the parents' presence either by custody or visitation.

In this case the children had a good balance with their two parents. Even if the parents are different in many ways, they still provided the children with everything necessary to meet their material physical and emotional needs.

The ability of the parents to cope with their differences in raising the children had been successful until the defendant decided <u>unilaterally</u> that the Plaintiff was not a good Mother anymore.

The Defendant had agreed in 1994 that the Plaintiff was a good Mother and that it was in the best interest of the children that she have custody while he had extended visiting rights:

"Whereas, <u>the Defendant has consented to sole legal and physical custody</u> of the subject child being awarded to Catherine Jane Von Kennel Gaudin subject to Defendant's right of reasonable visitation;…"
(Exhibit E-1 and E-2,1994 stipulated Judgment p.2 lines 1 to 4) (Emphasis added).

The defendant stated in his testimony:

"A. Well, in 1994 <u>I thought she was a good Mother.</u>" (P.51, line 19, Remis Transcript, December 14, 2000) (Emphasis added).

Both parents in this case love their children and <u>even if the circumstances presently seem to show otherwise</u>, the children deeply love their Father and their Mother.

As <u>Exhibit C-9</u> shows, the two children were <u>smiling and looking very happy</u> when their picture was taken in their Mother's home before the summer of 2000.

According to the Plaintiff and to the testimony of Pastor Paul Pelletier (who knows the children personally), they were happy with their Mother. The next-door neighbor, Mr. Mackenzie, (at the children's demand) even changed, his schedule to cut a tree with them <u>before</u> they left for visitation with their Father in June 2000 and never noticed any unhappiness or any change in behavior or energy.

<u>How could this be?</u>

Children are easily influenced by parents and also will act differently with each parent in order to keep their peace with them or to obtain from one parent what they know the other parent would not agree on.

When parents do not have a "support" with each other in their parenting of the children in order to maintain consistent decisions, the children, regardless upon which parent they make a demand, will find out easily that they can manipulate certain decisions of both parents.

In this case the "support" did exist "by tolerance" between the parents for years, but differences in opinion did culminate in a conflict when the idea of home schooling arose in the year 2000:

> "Q. If she had responded that she would <u>change her attitudes towards home schooling</u> and respond to your letter, what would that have indicated to you? as far as perhaps <u>her method of parenting?</u>

22

A. It would have been a... a departure from her lack of cooperation and affording any opportunity at co-parenting and discussing important issues in our sons' lives.

Q. And <u>would you have continued further discussion with her as far as other aspects of her parenting</u> with Andreas and Johnny?

A. <u>Yes.</u>

Q. Would it be fair to describe this <u>home schooling issue</u> as <u>the straw that broke the camel's back?</u>

A. <u>Yes.</u>"(p.52, lines 20 to 25, p.53, lines 1 to 9, Remis Transcript December 14, 2000).
(Emphasis added)

The Defendant's decision to ask for change of custody by way of an *ex parte* motion in Hawaii broke the agreement in the 1994 stipulated judgment. This disrupted the co-parenting relationship between the parties. It also has affected the relationship of the children with their Mother, as the children have sided in the custody issue with their Father (the Defendant). As a consequence, parental alienation has taken place to a high degree, reaching a point where now the children do need therapy for resuming a normal relationship with their Mother (such as existed when Defendant picked them up for visitation on June 9, 2000).

## 12) Since 1994 Plaintiff has always encouraged the relationship of the children with the Defendant:

The evidence shows that the children were always happy to see the Defendant for visitation when he picked them up at their Mother's house.

"Q....can you tell the court when you do get the guys, Johnny and Andreas, what....the first contact.. <u>What it's like for them to see you when you go pick them up?</u>

A. <u>The first contact is an explosion of love and affection.</u>"

"And they are eagerly waiting at the window...and when the guys come out of the house, it's like watching the start of a thoroughbred race and...and I'm the goal, and

23

it feels great. And, you know, <u>they come runnin' out and screamin' and hollerin' and jumpin' and hugging</u> and it's …it's quite a beautiful moment in time.

<u>And that has repeated every time I'm there."</u> (p.16 lines 7 to 11 and lines 15 to 20, Remis Transcript, December 12, 2000) (Emphasis added).

**13) The Plaintiff invites the Defendant into her house before his departure with the children:**

"…and so we sometimes linger a little bit and I think that <u>Catherine invites me in.</u> We…at some points <u>we're cordial.</u> And it was kinda nice, you know, in a formal way. And she would kinda like <u>have some food ready,</u> depending upon the time of the day and ….and <u>something to snack on."</u> ( p.17, lines 16 to 21, Remis Transcript, December 12, 2000) (Emphasis added).

**14) The Plaintiff consents to the summer activities choices of the Defendant for the children and never interferes:**

"…and so the summer of ….of '99 was extraordinary in terms of the <u>visit with Grandma,</u> the summer was spent here. Actually, ever <u>since the summer of '98, I have enrolled the guys at Punahou summer school. I've consulted with Catherine about it."</u>
(p. 30, lines 13 to 17, Remis Transcript, December 12, 2000) (Emphasis added).

**15) Since 1998 the Plaintiff has even consented to help the Defendant do some activities (Halloween) with the children, some of which she doesn't approve:**

"…Catherine knew I was coming. <u>I'd gotten her permission to do that.</u> The guys did not know so it was a <u>surprise."</u>

"…so they're jumpin' up and down and so on and so forth. And they were just finishing lunch and I… <u>Catherine invited me in</u> and we had…I think <u>she had a sandwich for me.</u> And then <u>we hung out for a while in the house,</u> then <u>went out trick-or-treating."</u> (p.33, lines 6 to 8 and 21 to 25, Remis Transcript, December 12, 2000).

"The…<u>we come back,</u> we unloaded I don't know how many pounds of candy. <u>We had dinner. We went out again.</u> Catherine was very <u>concerned about going out at night."</u>

"And so <u>we got home and lingered for a while</u> and the next morning at 6:30 my plane took off for Honolulu." (p 35, lines 10 to 13 and lines 22 and 23, Remis Transcript, December 12, 2000).

"Q….. Okay. And <u>Catherine participated in helping that be a surprise?</u>

24

A. <u>Yes.</u>"
(p 94, lines 15 to 17, Remis Transcript, December 13, 2000).
(Emphasis added).

**16) The Plaintiff respected and never interfered in the way the Defendant was exercising his visiting rights:**

"Q.Mr. Remis, during this whole time that you've had the boys <u>has Miss Gaudin ever expressed</u> to you directly <u>any concerns</u> she had <u>about the way you take care of the boys</u>? (p.42, lines 21 to 25, Remis Transcript, December 13, 2000).

A. <u>No."</u>
(Emphasis added).

This confirms the attitude and the testimony of the Plaintiff that she always respected

Defendant's way of parenting.

**17) The Plaintiff yielded to the Defendant's requirement for her relocation, even though it was distant from her family, but closer to the Defendant's family:**

"…she originally <u>wanted to return to her family in Switzerland,</u> in Geneva. I strongly <u>objected to that</u>."

"..and Catherine unilaterally <u>chose Montreal,</u> or the environs of Montreal, as to where she wanted to locate. <u>We discussed it.</u> It was kind of a <u>good idea in the sense that my family is primarily located in New York…..</u>" (p.6, lines 14 to 16 and lines 20 to 25, Remis Transcript, December 12, 2000).
(Emphasis added).

**18) The Plaintiff encourages communication between the children and the Defendant and respects their schedule:**

"Q. Yea, but actually what I was asking was as far as you know <u>has Catherine ever done anything to prevent you from communicating with your sons</u> the way you have described?

A. <u>As to faxes, No.</u>

Q. As to faxes and phone calls?

A. Well, <u>as to phone calls, we have a set time.</u> Okay? And there is no other time because of the answering machine.

Q. Okay. So <u>do you have a problem with a set time?</u>

A. <u>I don't have a problem with the set time…</u>"
(p.87, lines 15 to 25, Remis Transcript, December 13, 2000).
(Emphasis added).

**<u>19) The Plaintiff keeps the Defendant informed of any subject regarding the children as required by the 1994 stipulated judgment:</u>**

**<u>i) For the children's education she communicated the school reports and consulted the Defendant for his opinion on home schooling by sending the following letter:</u>**

28 April 2000

<u>Hi There Pa! How are you doing?</u> <u>The boys are doing fine.</u> Thank you for their Easter package. We are enjoying our Bible Time "Easter Series". <u>Enclosed are their school reports.</u> Please let me know by in writing, by fax or mail…once you have your travel confirmations and your summer plans with the boys set. For their medical insurance….Village Travel 450-458-7041.
<u>How do you feel about this?….John?…</u>In my estimation, it is of highest priority that our boys receive a Christian education. I am in the process of making arrangements for their <u>Home Schooling</u> for Grade Five and Grade Three. I am planning to use the <u>Bob Jones University</u> Home School curriculum including their HomeSat program. <u>I have asked that they send you their curriculum catalogues and the video on the Home Sat.</u> I plan to <u>supplement</u> their curriculum with French grammer and perhaps some Canadian geography in French. <u>Our pastor and his wife</u>, Paul and Kim Pelletier, whom you met <u>began Home schooling</u> using the Bob Jones University Curriculum last year. <u>His children are in the same grades as ours.</u> My half sister, Gloria Repp, a Christian author and writer of numerous books, <u>works for the Bob Jones University</u> Press and from what I understand, writes some of their curriculum reading material. <u>The boys are already reading and enjoying</u> a few of her books! We are looking forward to this new and exciting experience!
Take care of yourself, John,
Aloha, Catherine.
Isaiah 54:13 "And all thy children shall be taught of the Lord; and great shall be the peace of thy children."
Esaie 54:13 "Tous tes fils seront disciples de l'Eternel, Et grande sera la prosperite de tes fils."
(Exhibit C-4) (Emphasis added).

The Defendant in cross-examination gave the following answer regarding that letter.

" Q. Okay. When you got this, did you respond to it?

A. Not in writing

26

Q. How?

A. Well, <u>I call every Saturday</u>, and <u>so oft times she answers the phone</u>. Sometimes it's the boys, and <u>I just said that I don't think it's a good idea</u>."(p.116 lines 8 to 13, Remis Transcript, December 13, 2000). (Emphasis added).

**ii) For Johnny's shortness of breath and chest pains she informed the Defendant and went to see a doctor:**

"A. …<u>the first notice</u> that Johnny was suffering from shortness of breath and chest pains <u>was correspondence from Catherine</u>. And so that letter I got on…I think it was a Thursday." (p.101, lines 13 to 16, Remis Transcript, December 13, 2000). (Emphasis added).

Then Defendant after discussing that issue on the phone with Plaintiff sent the

following fax on May 27, 2000:

Dear Catherine,

<u>Seems Johnny is experiencing more than growing pains.</u> Did the Dr. do an EKG? Most of the heart tests I've read about probe blockage of vessels which is most unlikely for Johnny. Have you been referred to a cardiologist? My Dad died of cardiac arrest. A diagnosis of angina was made in 1972. Prior to that Dad had chosen the Dr. Atkins diet and indulged in bacon and other fatty foods with relish. Of course, he smoked 3 packs of cigarettes a day. After the diagnosis, Dad changed his diet completely and undertook daily exercise. In 1991, the average life expectancy for a white male was 73. My last full half-day physical in 1998 led to a comment by the Dr. that I had the internal chemistry/function of a 25 year old.

I'll be in Hudson on 6/10, about 9:00AM. <u>Our itinerary will be similar to years past.</u> We'll leave Grandma's on 6/20. Classes begin 6/19 and the school knows the boys will start 6/21. Classes run from 8-12. Unless court intervenes, I shall pick the guys up and spend the balance of the day with them. <u>Our usual</u> Big Island visit has not yet been set. <u>We'll arrive back in Hudson 8/5.</u> You will be called 4:30 on Saturdays. <u>I shall have the usual</u> health insurance secured thru Village Travel on 6/5 and ask that they call you for pick-up.

<u>Thank you for my traditional birthday song and the boys for their cards.</u> Seems there has been a nagging cold/sore throat bug in The Islands. Just when you think it's gone, it bites again.

<u>Mom is doing well with her gardening,</u> weather permitting.

Aloha for now,

(Exhibit C-5). (Emphasis added).

27

The Defendant explained about the reason for sending the fax:

"A…This was…this was in answer to a question from Catherine to…she said what is your Dad's condition and what is your condition, because of her concern about the heart." (p. 105, lines 10 to 13, Remis Transcript, December 13, 2000).

"….my question to you is did you have further communications with Catherine about that condition? that Johnny had?

A. We had conversation in…..about that, yes.

Q. And when you came in June?

A. I'm not sure when the conver….it was after I knew what had happened and I think I'd asked her if she'd done anything else other than go to….because she had told me before that everything's okay.
So at that point in time I had asked her if there were any follow-ups. Okay? And she said everything was fine, and she didn't go back to the Doctor. And so that ended it. Coupled with the information that I received from Johnny, coupled with the fact that there weren't any further episodes, I…..that was the end of my inquiry." (p.106, lines 4 to 19, Remis Transcript, December 13, 2000).
(Emphasis added).

**20) The Plaintiff sees to it that the children remember their Father's Birthdays:**

"Q. Okay. Then at the bottom of this letter of May 27th, you say thank you for my traditional Birthday song and the boys for their cards. Well, what is the traditional Birthday song?

A. Catherine sings …plays the piano and sings Happy Birthday.

Q. on the ….on the phone?

A. On the phone.

Q. And then the boys send you cards on your….for your Birthday?

A. I would say, yeah. I mean, they do send me cards when they get there. It's …but for the most part, yes.

Q. Okay. So they generally give them to you when you get here?

A. No, no. <u>I've gotten cards in the mail."</u> (p.110, lines 3 to 18, Remis Transcript, December 13, 2000).

"Q. Do you know if <u>Catherine has been part of the effort</u> to see to it that Dad gets his Birthday cards?

A. <u>Of course</u> she's been part of the effort".
(p.111, lines 1 to 3, Remis Transcript, December 13, 2000).
(Emphasis added).

## <u>21) Defendant has had physical custody of the children for the last 7 months resulting in parental alienation from their Mother:</u>

The action of the Father in not respecting the stipulated Judgment, has caused harm to the children and contributed to the parental alienation from their Mother.

The custody issue could have been reviewed according to the stipulated judgment by a Canadian family court and thus would not have involved the children in jurisdictional court conflicts and procedures.

The children have now sided with the Defendant against their Mother and have <u>nothing positive to say about their Mother</u>. This behavior of the children towards their Mother was sudden and markedly obvious only since the Defendant picked them up for their summer visitation on June 9, 2000 and has continuously escalated since that time.

This shows that the <u>Defendant is not able to maintain and encourage the relations of the children with the other parent</u>.The Plaintiff on the other hand has always encouraged and maintained those relations with the Defendant.

## <u>22) The Plaintiff is very flexible, which is an appropriate quality for the custodial parent, as shown by the following events:</u>

a.) Plaintiff requested at the beginning of the Family Court trial that a family psychological assessment and evaluation be done for the best interest of the children. The <u>Defendant strongly objected to that proposal,</u> apparently because of

29

the level playing field it would have created, something one would have expected

Defendant Remis to welcome ;

b.) Plaintiff testified that if there is change to be made in her parenting, she is

willing to do so for the best interest of the family.

## 2) This Court was misled by the evidence produced as exhibits by the Defendant in the Federal Court proceedings.

The following documents produced by the Defendant in the Federal Court as exhibits

were proven during the course of the Family Court trial to contain <u>false and misleading</u>

<u>allegations</u>:

### a) The July 26, 2000 defendant's declaration supporting the *ex parte* motion.

Defendant at that time was exercising his visiting rights from June 9th until

August 5th and <u>could have sought the same judgment by the Canadian court</u>

<u>while keeping the children in Hawaii under his visiting rights</u>. By <u>not</u> doing so,

the Defendant committed a breach of the Hague Convention which leads to

"harmful effects" to the children (see preamble of the Hague convention) which is

in itself against the best interests of the children because it deprives them of a

custody hearing in the country of their habitual residence, which Canada has been

for the past six years.

- The Defendant in his declaration supporting the *ex parte* motion stated:

    " I met with Dr. Lehrke on July 20, 2000, for a review of the current status of
    Catherine's conduct and the negative effects on John and Andreas, <u>it was Dr.
    Lehrke's opinion that Catherine's mental state was deteriorating</u> and there was a
    real concern for the welfare of the boys." ( Exhibit D-1, *Ex Parte* Motion,
    Declaration of John R. Remis, Jr. P.3, lines 3 to 7) (Emphasis added).

30

- However, contrary to defendant's declaration, Dr. Lehrke's testimony was to the effect that <u>she had no opinion about Catherine,</u> but in fact it was the Defendant who felt the children needed to be seen not her:

  " Q. All right. So the next time that you saw anybody in connection with the Remises would be in a meeting on July 20th, 2000 ?

  A. Yes

  Q. And <u>what did Mr. Remis tell you</u> he wanted to have that meeting about ?

  A. He indicated that, um - - that he was again worried about the children that <u>he felt that I should see the children</u> because they seemed upset to him, um, he said that, again, John, Jr., appeared even more depressed than before and sullen, and that he felt - - he felt the children were not very communicative. He thought their personalities were changing, and he had - - <u>they were talking to him about the prospect of their mother home schooling them</u> and saying that they really did not want that, <u>and so he felt they needed to be seen.</u> (p.31 lines 7 to 23 Lehrke Transcript, December 19, 2000) (Emphasis added).

- The Defendant also alleged in his declaration supporting the *ex parte* motion :

  "- - <u>it is urgent</u> that a temporary change of custody be granted and a psychiatric evaluation of Catherine be undertaken. - -" (Exhibit D-1, p.3, lines 11 and 12 *ex parte* motion, declaration of John R. Remis). (Emphasis added).

The <u>urgency</u> of the best interest of the children <u>was not</u> the motive for the defendant's *ex parte* motion to the Hawaii family court on July 27, 2000, for the following reasons:

- The Defendant, exercising his visiting rights, picked up the children in Canada on June 9, 2000;

- According to the Defendant's testimony, when he had his first visit with Dr. Lehrke in 1999, he should have returned to consult her if something "happens" or if " 'something' gets worse" with the children:

  "So I went to find out what if anything I should do and basically I left there, in terms of Dr. Lehrke's office here, with the fact that the boys were healthily rejecting these actions to this point in time, with a

31

recommendation that if something happens I should return." (p.41 Remis lines 19 to 23, Transcript, December 12, 2000); (Emphasis added).

- According to the Defendant's testimony, the children at the time he picked them up this year for summer visitation, were <u>supposedly in the worst state they had ever been.</u>

> " Q. - - Can you tell the court briefly your observation of the children when you picked them up this year for summer visitation" (p. 7 lines 25 and p. 8 lines 1 and 2, Remis Transcript, December 13, 2000).

The Defendant described from pages 8 to 13 of his December 13 transcript testimony, <u>how bad</u> the condition of the children was, concluding that:

> " I knew this was beyond my ability to heal it, and consulted again with Dr. Lehrke, because she said <u>come back if somethin' gets worse</u> and --and <u>this was **much much much worse**</u>." (p. 12 line 25 and p.13 lines 1 to 3, Remis Transcript, December 13, 2000). (Emphasis added).

- However, even though the children's state was supposedly "much much much worse", the Defendant chose <u>not to follow Dr. Lehrke's recommendation</u> and did not consult with her while the children were supposedly in that state. The Defendant <u>waited two (2) months</u> to consult with Dr. Lehrke (August 3, 2000), which coincides with the period of time when  he received notice of proceedings from Plaintiff in Canada (July 26, 2000) and when he started to petition the Hawaii Family Court for change of custody (July 27, 2000) at which time the hearing date was set for August 31, 2000;

The Defendant made the decision to make an appointment with Dr. Lehrke to see the children on August 3, 2000, <u>only after</u> his *ex parte* motion of July 27, 2000.

" Q. Okay. When was the decision made to bring the boys in August 3 ?

32

A. I think the decision was I'm gonna make an application for temporary custody and if it were granted I would then bring the boys in. So I - - I assume as I - - I don't exactly remember making the appointment date wise, but it would have been after the 27th because that's when the order was signed and that's when I made the appointment so that they could be evaluated."(p.31 lines 1 to 9, Remis Transcript, December 14, 2000).

- Apparently, once the children were with the Defendant on June 9, 2000, they changed for the better. When asked how the children were doing since he picked them up, the Defendant stated:

    " Q. Between the time you picked them up until now.

    A. Oh absolutely,

    A. - -Ab - - the - - the <u>changes are enormous</u> we've had - - well, the cha - - the changes I would say <u>from perhaps three weeks into the summer</u>, so it would be approximately the beginning of July, Johnny started to stutter less. There was a more relaxed attitude." (p.14 lines 24 and 25, p.15 lines 4 to 8, Remis Transcript, December 13, 2000)

    " - - - - I can see that whatever was disturbing them was becoming more relaxed." (p.15 lines 13 and 14, Remis Transcript, December 13, 2000). (Emphasis added)

- Except for one additional visit on November 10, 2000 with Dr. Lehrke at the request of the Defendant (following the police report and the CPS intervention), there was still no therapy started for the children as of the date of the Defendant's testimony on December 14, 2000:

    "Q. Okay. And then subsequent to November 10[th] she wrote you a letter dated November 17[th,] correct?

    A. I'm not sure what the date of the letter was" (p.34 lines 2 to 4 Remis Transcript, December 14, 2000).

    "Q. Okay. And now, have you spoken to her since you received that two page report?

    A. Yes.

Q. Okay. What about?

A. About therapy for the boys" (p.34 lines 11 to 15, Remis Transcript, December 14, 2000).

"Q. Okay. Has there been <u>any therapy</u> of John or Andreas between that report date of November 17[th] and today?

<u>A.</u> <u>No</u>"
(p.36 lines 6 to 8, Remis Transcript, December 14, 2000).

"Q. Okay. And now, can you tell me <u>why the treatment hasn't started</u> with Johnny as of the 14 of December?

A. I have an appointment with Biodyne - - -
- - December 29th I think is what the earliest appointment was - - - -
- - And so the next available date of treatment, to <u>enroll them both in treatment</u> right is the <u>beginning of January</u>." (p.40 lines 15,17,18 and 22 to 24, Remis Transcript December 14, 2000)(Emphasis added).

**b) The August 30, 2000, affidavit of Dr. Sue A. Lehrke and Dr. Lehrke's letter of November 17, 2000.**

Judge Bryant in his September 2000 order, granted Defendant's motion for temporary

physical and legal custody and denied plaintiff's application to decline jurisdiction,

saying that :

" The court further finds that a grave risk exists that the children will be psychologically harmed if they were returned to their mother" (Exhibit D-2, Order p.2, September 25, 2000)  (Emphasis added).

The Court believed this to be true  "<u>significantly based" upon the report of Dr. Sue</u>

<u>Lehrke.</u>

" This Court especially believes this risk exists as to the content of the proposed home-schooling (1) of the children, and <u>more significantly, based upon the report of Dr. Susan Lehrke,</u> that the children's' mental health is under severe stress...."(Exhibit D-2, Order P.2, September 25, 2000 ) (Emphasis added)

---

(1) There is no allegation or evidence whatsoever to support a finding relative to the quality or the content of the home schooling. The Defendant testified at the Family Court trial that he did not know the content of the home schooling program <u>at all.</u>

" Q. Okay. Now do you have a problem with the content of the curriculum in the home school program?"
A. I don't know its content (p.121, lines 20 to 22, Remis Transcript, December 13, 2000).

- The Defendant <u>knew</u> and never disclosed to this Court, that Dr. Lehrke would <u>not testify</u> to support the opinion about custody and visitation that she stated in her affidavit:

  > "Q. So then you knew at least when you drafted the letter that what you were putting in that letter <u>was potentially gonna be used by Mr. Remis to assist him in his effort to change custody of the children</u>:
  >
  > A. <u>No</u>, that's not an accurate statement.
  >
  > Q. Oh, it's not ?
  >
  > A. Nope.
  >
  > Q. In what way is it not accurate ?
  >
  > A. **I told** Mr. Remis **early on**, and **I kept repeating it to him**, that he needed to have the court appoint a custody guardian ad litem to do an investigation of the case. And that once a Custody Guardian Ad Litem was in place, I would defer to that person's findings and recommendations (2) and that I - - I <u>had told him</u>, I don't know, <u>maybe five times, that I will not make any comparative statements with respect to a custody determination</u>. I've also told Mrs. Chang that. That's not my role." (p.38, lines 10 to 25, Lehrke Transcript December 19, 2000). (Emphasis added).

- The reason she met with the children was for interview purposes and <u>no tests were made</u>:

  > " Q. All right. And what - - <u>did you perform any tests</u> with each - - with either of the boys?
  >
  > A. <u>No</u>
  >
  > Q. What's the protocol on - - in an initial meeting with a child?
  >
  > A. Generally, the first one or two meetings are diagnostic evaluations, which means <u>interview evaluation</u>." (p.33, lines 8 to 14, Lehrke Transcript, December 19, 2000) (Emphasis added).

---

(2) Much was made by Dr. Lehrke of her primary role being for the purpose of seeing to it that a CGAL was appointed, yet none of her letters of August 29, 2000 (Exhibit Y) and November 17, 2000 (Exhibit 17) or her affidavit of August 30,2000 (Exhibit B) mentions this need at all. Rather, the only time it <u>is</u> mentioned is in her letter to Mrs. Chang and Mr. Lynch dated December 15, 2000, and then as a rationale why she wouldn't be testifying about <u>any opinion</u> (Exhibit 15).

- The fundamental and essential fact revealed by the Family Court trial is that Dr. Lehrke's affidavit and letter which have been cited by Judge Bryant, Marianita Lopez and Judge King as the significant factor in the foundation and declaration of "grave risk" of psychological, harm are false and misleading in the extreme to the point that according to Dr. Lehrke, her opinion should <u>not be given much weight at all</u>:

> " A. - - . The therapist has such a limited point of view on the case that their information <u>is not of very great weight in my opinion legally</u>." (p.56 lines 3 to 6, Lehrke Transcript, December 19, 2000) (Emphasis added).

> " A. My role in the case is so limited, my point of view on it <u>is very limited</u>. - -." (p.24 lines 2 and 3 Lehrke Transcript December 19, 2000).(Emphasis added).

> "A. - -. And once the custody guardian ad litem came on the case, in my opinion, my - - my opinions are no longer - - <u>should no longer be given as much weight</u> as the custody guardian ad litem's. - -." (p.27, lines 5 to 8, Lehrke Transcript, December 19, 2000) (Emphasis added).

In fact there was great reliance by the CGAL, Judge Bryant of the Hawaii Family Court and Judge Samuel P. King of the U.S District Court for the District of Hawaii on the four page Lehrke affidavit prepared by Defendant Remis (based on a Lehrke letter to Remis dated August 29, 2000) This affidavit was prepared by Dr. Lehrke to 1) explicitly assist Remis to take custody of his children from their Mother and 2) did so by stating in the affidavit an opinion that would cause the reader to believe that there would be significant psychological harm to the children if they returned to their mother. This opinion was rendered by Dr. Lehrke notwithstanding that she never had any ability or intention to opine on a recommendation of custody of these children and would therefore refuse to testify as to the conclusion in the affidavit and notwithstanding that she did not know

36

what was " really going on here":

"A. I really don't have opinions about the overall situation at this point because I feel that's the job of the custody guardian ad litem, to look at it from all angles and - - and say what's really going on here;" (P. 52, lines 5 to 8, Lehrke Transcript,  December 19, 2000). (Emphasis added).

- Following her observation of the children on August 3, 2000, Dr. Lehrke finds the condition of the children is not serious enough to prevent them from returning to Canada; in fact, she admitted that the children could be returned to Canada to their mother's home so long as they received treatment, which she would have recommended by letter :

" Q. And so did you determine that they needed treatment ?

A. I thought that they would probably need treatment. I didn't know whether they were going to be here or in Canada, but I told Mr. Remis that I thought they were probably gonna need treatment.

Q. Okay. I take it from your statement that if they went back to Canada that is something that they could do so long as they were receiving treatment.

A. I would have recommended at that point that they, um, have treatment in Canada. Probably by letter."
(p.34, lines 3 to 13, Lehrke Transcript, December 19, 2000) (Emphasis added).

**3) This Court was not informed that Dr. Lehrke's Letters and Affidavit, were in fact and in law incompetent under the mandatory requirements of the American Psychological Association Ethics Code:**

**a) Dr. Lehrke's Letters, Affidavit, and testimony are incompetent and irrelevant and should not be given any weight by this Court;**

37

**i) Dr. Lehrke performed forensic functions for John Remis in this case and did so in direct violation of the mandatory rules for psychologists in such cases, and then deliberately misled the family court under oath.**

Paragraph 5 of the affidavit of Doctor Lehrke demonstrates that she gave an unqualified opinion on the ultimate issue, child custody, via affidavit in a contested case:

> " 5. As a result of my evaluation of Andreas and John A. Remis, I have significant concerns about their mental health. Specifically, it is my <u>opinion</u>, based upon information available to me to date that <u>the return of these boys to live with their mother would result in significant damage to their mental health.</u>"
> (Exhibit D-3, affidavit of Dr. Sue A. Lehrke) (Emphasis added).

By giving this expert "opinion" on the <u>psychological characteristics of the Plaintiff</u> whom Dr. Lehrke had not met, Doctor Lehrke performed a forensic function as defined by the Ethics Code of the American Psychological Association (APA Ethics Code).

A <u>"forensic function"</u> refers to professional activities performed by a psychologist in legal and judicial contexts, regardless of whether she identifies herself as a "forensic psychologist".

The APA Ethics Code states:

> "7. Forensic Activities
>
> 7.01 Professionalism
>
> Psychologists who perform <u>forensic functions</u>, such as assessments, interviews, consultations, reports, or expert testimony, <u>must comply</u> with all other provisions of this Ethics Code to the extent that they apply to such activities."
> (Exhibit C-6, Ethics for Psychologists p.146) (Emphasis added).

The commentary accompanying this section of the APA states:

> "This section of the Ethics Code is not just for the use of 'forensic psychologists', <u>it is for all psychologists when they are performing forensic</u> or potentially forensically relevant <u>functions.</u>"
> (Exhibit C-6, Ethics for Psychologists p.145 lines 1 to 3) (Emphasis added).

The APA Ethics Code further states:

"7.01 Professionalism

7.02 Forensic assessments

(a) Psychologists' forensic assessments, recommendations, and reports are based on information and techniques (including personal interviews of the individual when appropriate) sufficient to provide appropriate substantiation for their findings." (Exhibit C-6, Ethics for Psychologists p.147 and 148) (Emphasis added).

The commentary on Section 7.02 (a) states:

"By contrast, in doing custody evaluations, interviewing both parents is expected, with efforts made to arrange such meetings. Failure to interview a parent calls for explanation of why the interview could not be held, and that omission must be reflected in the report of and scope of findings. As discussed in the next section, a custody recommendation, for example, may not be possible in these circumstances."(Exhibit C-6, Ethics for Psychologists p.148 line 15 to 21) (Emphasis added).

The APA Ethics code further states:

"7.02 Forensic assessments

(a)....

(b) Except as noted in (c), below, psychologists provide written or oral forensic reports or testimony of the psychological characteristics of an individual only after they have conducted an examination of the individual adequate to support their statements or conclusions". (Exhibit C-6, Ethics for Psychologists p.148)

The APA Ethics code specifies the limitations on expert opinions in cases such as this:

" 7.02 Forensic assessments

(c) When, despite reasonable efforts, such an examination is not feasible, psychologists ... appropriately limit the nature and extent of their conclusions or recommendations." (Exhibit C-6, Ethics for Psychologists p.149) (Emphasis added).

The commentary on Section 7.02 (c) states:

> "This section provides guidance in situations when, despite reasonable efforts, the psychologist may be unable to do the personal examination addressed in 7.02b. It addresses three considerations.
>
> **First,** it requires that 'reasonable efforts' have been made to do the examination of the individual and these have not been successful. (Exhibit C-6, Ethics for Psychologists p.149 line 26 to 30) (Emphasis added).
>
> **Second,** when the evaluations have proceeded, the data are considered to be "limited", and the psychologist, in reports and testimony, must explain how the limited evaluation affects the reliability of the 'reports and testimony'. (Exhibit C-6, Ethics for Psychologists p.149 line 44 to 45, p.150 lines 1 and 2) (Emphasis added).
>
> **Third,** this rule requires that when the personal examination has not occurred, the psychologist refrains from drawing conclusions and making recommendations that go beyond the limits of the data.
>
> In other words, even if the psychologists follow the stipulations, clarify that the impact of the information is limited, and limit the nature and extent of their conclusions or recommendations accordingly, there are some types of conclusions and recommendations that are precluded. Under this standard, in a child custody case in which only one parent was evaluated and it was not feasible to evaluate the other, although the psychologist may make statements about the parent who was not seen as long as he or she does not go beyond the data and does qualify conclusions by acknowledging the limitations imposed by the incompleteness of the data collected, it would generally be improper for the psychologist to offer an opinion of the missing parent's parental qualities or make a custody recommendation." (Exhibit C-6, Ethics for Psychologists p.150 line 15 to 17, p.150 lines 19 to 29) (Emphasis added).

Dr. Lehrke knew that her affidavit would be used in adversarial child custody proceedings. She therefore performed a forensic function in this case notwithstanding her subsequent representation to the court that she is only a "child psychologist" or a "treating psychologist" and not a forensic psychologist or a psychologist performing forensic function.

When asked by Plaintiff's counsel whether she knew the purpose for which her affidavit

had been sought by the Defendant she replied:

> A. I was aware that he was going to use the affidavit, attach it to something that he was presenting to the court.

> Q. Yeah, but you do know and you've been down here a fair amount of - - number of times. <u>You do know that what he was doing was going for a change in custody from their mother to himself, correct?</u>

> A. <u>Yes.</u>
> ( p.37, lines 13 to 21, Lehrke Transcript, December 19, 2000) (Emphasis added)

Dr. Lehrke also knew that her report dated November 17, 2000 would be used in

adversarial legal and judicial activities,

> Q. Okay. As you understand it, did Mr. Remis ask you for this written report dated November 17[th]?

> A. Yes.

> Q. Okay. And your first sentence says to whom it may concern. Now, if I may ask you, why is it addressed that way?

> A. Well, Mr. Remis asked me for an update on my treatment. And <u>ordinarily this would go to the court</u> or to the custody guardian ad litem. He asked me just to send it to him. And since it's a - - it's a kind of a generic update, I just addressed it to whom it may concern and figured <u>it would probably end up in court.</u> (p.52 lines 21 to 25, p.53 lines 1 to 7, Lehrke Transcript, December 19, 2000) (Emphasis added).

Dr. Lehrke said that she belongs to the American Psychological Association and

subscribes to their ethics.

> Q. All right. Let me just - - do you subscribe - - do you belong to the American Psychology Association?

> A. Yes.

> Q. And do you subscribe to their ethics?

> A. I subscribe to their ethics whether I like it or not.

(p.57 lines 14 to 19, Lehrke Transcript, December 19, 2000)

The commentary on the APA Ethics Code regarding "Forensic Activities" further states:

"It should be emphasized that psychologists who render expert testimony in court are not 'just giving opinions,' they are providing expert opinions based on professional knowledge, skill, and techniques. Their opinions <u>have much weight</u> and can have <u>great effects on the lives of the individuals concerned</u>." (Exhibit C-6, p.145 line 32 to 36) (Emphasis added).

"They need to be aware that an <u>incompetently performed custody evaluation</u> and attendant testimony could lead to an <u>individual's inappropriate loss of his or her children</u>. It is clearly, then, of the <u>utmost importance</u> that assessments and tests done for the court <u>meet the applicable standards set in this section</u> of the Ethics Code and that requirements of all other related standards be met."
(Exhibit C-6, Ethics for Psychologists p.146 lines 25 to 30) (Emphasis added).

Dr. Lehrke seems to have ignored the impact of her affidavit and letters in this case, and subsequently attempted to mitigate the effects of her opinion, but it was <u>too little</u> compared to her affidavit of August 30 and letter of November 17, and <u>too late</u> (12/19/00) to avoid the damage she caused.

" A. My role in the case is so limited, my point of view on it <u>is very limited</u>. - -." (p.24 lines 2 and 3, Lehrke Transcript, December 19, 2000).(Emphasis added).

"A. - -. And once the Custody Guardian Ad Litem came on the case, in my opinion, my - - my opinions are no longer - - <u>should no longer be given as much weight</u> as the custody guardian ad litem's. - -." (p.27. lines 5 to 8, Lehrke Transcript, December 19, 2000) (Emphasis added).

Dr. Lehrke knew the importance of contacting the Plaintiff, but was <u>professionally incompetent</u> in failing to do so, causing the Plaintiff irreparable harm in this case.

Dr. Lehrke is now claiming that section 7 of the Code does not apply to "treating psychologists" in ignorance (or worse) of the definition of "forensic function";

Q. (BY MR. LYNCH) When despite reasonable efforts said - - <u>this is the canon itself, 7.02 (c)</u>, as in Charles. When despite reasonable efforts such an examination is not feasible, psychologists clarify the impact of their limited information on the reliability and validity of their reports and testimony, and they appropriately limit the nature and extent of their conclusions or recommendations.

42

Now, would that apply to your role as a child psychologist?

A. If it's a - - if it's a canon re - - related to forensic psychology, it would not apply to my role as a treating psychologist. But I did in fact state some limitations of my data and I did in fact qualify my conclusions.

Q. Well, you're saying that you've complied with this rule notwithstanding it doesn't apply to your role?

A. I'm - - I' m - - not saying whether I complied or didn't comply with it. I'm saying that is a rule for forensic psychologists and I was functioning as a treating psychologist. But I am saying as a matter of fact that I did in fact state the limitations of my data and I did in fact qualify my conclusion.

Q. Okay. In the four-page affidavit, which is - - that we've been talking about, the one that's dated August 30th, where are the limitations?

A. It's my opinion - - first of all, it's based on the information available to me to date, which is limited.
(p. 66 lines 9 to 25, p.67 lines 1 to 10, Lehrke Transcript, December 19, 2000) (Emphasis added).

In fact the distinction attempted by Dr. Lehrke does not exist in this instance, and it is incomprehensible that she did not know that when she attempted to fool the Court and the parties. She was under oath and intentionally sought to mislead the Court and counsel so as to draw attention away from her gross negligence if not intentional behavior.

The commentary to Section 7.02 (c) provides that under circumstances present here, "…it would generally be improper for the psychologist to offer an opinion of the missing parent's parental qualities or make a custody recommendation."

Dr. Lehrke's professional incompetence by making such a report in violation of section 7 of the Code is exacerbated by her apparent gross negligence or wanton disregard in not knowing the rules of practice for licensed psychologists.

"Q. I am talking about a forensic psychologist.

43

A. Um, <u>I don't know</u> whether a forensic psychologist can offer opinions to the court based on limited information or not. Generally, though, it's not the common practice. <u>I don't know</u> whether there are exceptions, but in general that would not be the common practice."
(p. 71 lines 17 to 22, Lehrke Transcript, December 19, 2000)

Dr. Lehrke admitted that her affidavit and report should never have been used the way it was;

"A. I think I might not have worded that sentence as well as I should have. I think that, you know, when I read it now <u>I can see that it can be read in other ways</u>, but that is all I was intending to do at that point. <u>And I apologize if the wording of that - - those sentences caused problems in the case.</u>"( p.63, lines 16 to 21, Lehrke Transcript, December 19, 2000) (Emphasis added).

In conclusion the following breaches of the Code by Dr. Lehrke are at minimum professional negligence and produced an incompetent report/affidavit :

- Dr. Lehrke did not make any attempt to contact the Plaintiff while doing the forensic task of evaluation of her two boys and in giving an opinion on the plaintiff's parental qualities;

- Dr. Lehrke's report did not properly qualify the impact of her limited information by <u>not</u> explaining how her limited evaluation would affect the reliability and validity of her entire report;

- Dr. Lehrke at the trial essentially withdrew her opinion, claiming that it was not within her role as a "child psychologist" to render an opinion and that she was not doing "forensic"work (even though Judge Bryant used her affidavit as grounds to award a temporary change of custody of the children to the Defendant);

- Dr. Lehrke admitted "surprisingly"at the trial that her report should not be given much weight at all. However, it had a **lot** of weight when it was presented to judge Bryant and this Court in this case, leading the Plaintiff to lose the custody of her children ;

That leaves the Defendant with <u>no valid expertise (or opinion)</u> on psychological harm that would be considered a "grave risk" by <u>clear</u> and <u>convincing evidence</u>.

All defendant has is his own self-serving statements related to hearsay statements to him.

**4) The Defendant never disclosed to this Court that his objective was to petition the Hawaii Family Court only for a more convenient forum for himself and for his solely personal and economic concerns:**

Defendant was served on July 26, 2000 with a motion of the Plaintiff in recognition and enforcement of foreign decisions that led to a decision declaring the 1994 Family Court judgments enforceable in the Province of Quebec, Canada (Exhibit C-1).

On July 27, 2000 Defendant petitioned the Hawaii Family Court with his *ex parte* motion for temporary restraining order and order awarding temporary custody of minor child instead of petitioning the Canadian Family Court which, contrary to his protestation otherwise,cannot be explained other than that he did so for a more convenient forum for himself and for his personal economic concerns;

- The Defendant sent an e-mail to plaintiff on July 2, 2000 stating clearly his intention to proceed to a change of custody, if Plaintiff would not cancel her plans for home schooling the children.

  " Dear Catherine, it is my firm belief that it is not in the best interest of John Anolani Remis, IV and Andreas Wailani Remis to be home schooled. It is asked that you consider a change in custody now. It is further requested that you advise me as to whether or not you will cancel your plans for home schooling this coming year and forever. I ask you to enroll John and Andreas in St. Thomas for the fall. Your response is requested by 7/8/00. If you do not agree, I shall take all steps reasonable and necessary to effect a change of custody of our sons.- - -." (Exhibit 5). (Emphasis added).

- The Defendant made a clear admission in his testimony that the reason he had petitioned the Hawai'i family court instead of the Canadian family court, was for personal financial reasons only:

  " Q. Okay. So would it be fair to state that if she had turned around by July 8[th] and said, okay, I won't do home schooling, then you would have sent the boys back on August 5[th]? Or taken them back on August 5[th]?

45

A. Maybe.

Q. What do you mean maybe?

A. Well, because the reality is - - is that this was like the beginning of July, and another week passed by and I started researching the potentials for dealing with the issue that was in the judgment <u>about having Canadian court have jurisdiction</u> just by the clause that was in the agreement. And so I - - <u>I thought I was stuck with going there</u>. Okay?

And then I - -

Q. Why - - excuse me. <u>Why did you consider that stuck</u>?

A. <u>Well, you've seen my financial statement</u>. Okay. In terms of the effort of - - of pursuing this, I - - I don't  know how I could possibly have pursued this in Canada. I just don't know.

Q. <u>Because you couldn't afford an attorney in Canada</u>, is that what you're saying?

A. <u>An attorney, traveling costs, all of that</u>. And - - and so I began to research to see what is the jurisdictional issue <u>to permit me to proceed here</u>. - - ." (p.186, lines 2 to 25 and p.187, lines 1 to3, Remis Transcript, December 13, 2000). (Emphasis added).

Thus the reason for petitioning the Hawaii Family Court instead of the Canadian Family Court, was not based upon the condition of the children and their Mother, but for the obtaining of a less expensive and more convenient forum for the Defendant.

The Hague Convention goal is to prevent the course of action that has been taken by the Defendant, which is <u>"forum shopping"</u> in order to find a more sympathetic Court at less cost to him. Those actions have been condemned by the jurisprudence as being in direct violation of the content  and spirit of the Hague Convention. (Exhibit P, <u>Friedrich vs. Friedrich</u> (6th Cir. 1996) 78 F. 3d 1060).

46

### i) The Defendant engaged in an abuse of process in order to obtain a more convenient forum:

The *ex parte* motion for restraining order and temporary custody in Family Court is designed to be used only for <u>urgent matter,</u> because it involves omitting notice to adverse parties. Rule 65 of the Hawaii Family Court Rules states as follows:

"VIII. Provisional and final remedies and <u>special proceedings</u>

Rule 65. Injunctions.

(a) reserved.

(b) Restraining order; notice; hearing; duration. A restraining order may be granted without notice to the adverse party <u>when it clearly appears</u> from specific facts shown by affidavit or by the verified complaint or cross-complaint <u>that immediate relief to the applicant is appropriate.</u> Every restraining order granted without notice shall be served forthwith upon any party or parties affected by the order and shall continue in effect until further order of the court. On 2 days notice to the party who obtained the restraining order without notice or on such shorter notice to that party as the court may prescribe, the adverse party may appear and move its dissolution or modification and in that event the court shall proceed to hear and determine such motion as expeditiously as the ends of justice require." (Emphasis added).

The Defendant by <u>waiting until the end of his summer visiting period</u> to file his *ex parte* motion (July 27, 2000) abused the process of the Family Court, and this is shown by the following facts:

- All the facts stated in his Declaration were known at the time of his summer visitation on June 9, 2000, as at that time supposedly they were in the <u>"much much much worse"</u> state;

- The Defendant then waited two (2) months before bringing the children to Dr. Lehrke demonstrating that there was no "urgency";

47

- The Defendant in his declaration supporting the *ex parte* motion stated:

  " I met with Dr. Lehrke on July 20, 2000, for a review of the current status of Catherine's conduct and the negative effects on John and Andreas, <u>it was Dr. Lehrke's opinion that Catherine's mental state was deteriorating</u> and there was a real concern for the welfare of the boys." (Exhibit D-1, *ex parte* motion, Declaration of John R. Remis, Jr. P.3, lines 3 to 7) (Emphasis added).

- However, contrary to Defendant's declaration, Dr. Lehrke's testimony was to the effect that <u>she had no opinion about Catherine,</u> but in fact it was the Defendant who felt the children needed to be seen not her:

  " Q. All right. So the next time that you saw anybody in connection with the Remises would be in a meeting on July 20th, 2000 ?

  B.  Yes

  Q. And <u>what did Mr. Remis tell you</u> he wanted to have that meeting about ?

  A. He indicated that, um - - that he was again worried about the children that <u>he felt that I should see the children</u> because they seemed upset to him,  um, he said that, again, John, Jr., appeared even more depressed than before and sullen, and that he felt - - he felt the children were not very communicative. He thought their personalities were changing, and he had - - <u>they were talking to him about the prospect of their mother home schooling them</u> and saying that they really did not want that, <u>and so he felt they needed to be seen</u>. (p.31 lines 7 to 23 Lehrke Transcript, December 19, 2000) (Emphasis added).

- The Defendant knew he was <u>"stuck with going" to the Canadian family court</u>, but supposedly did not have the financial resources to do so (even though he did have a Canadian attorney for representation on the motion under the Hague Convention in Canada) (Exhibit C-2, page 6);

- The Defendant knew <u>there was no urgency</u> but chose to proceed by an *ex parte* motion in order <u>to give jurisdiction</u> to the family court in Hawai'i without notice;

48

- The Defendant never asked the Plaintiff for her consent to go see Dr. Lehrke, and then also used the *ex parte* motion to avoid the necessity of doing so:

> " Q. Okay. Did he give you any explanation as to <u>why</u> having picked them up on June 9[th] <u>he waited till July 14[th] to call for an appointment</u>.
>
> A. Well, I understood that <u>it was not very clear whether the boys were even going to be here long enough for me to be seeing them</u>. And also there were - - there were some things going on in court that - - <u>I had told Mr. Remis that there was no way I could see the boys unless their mother agreed</u>, - - ." (p.32 lines 3 to 11, Lehrke Transcript, December 19, 2000) (Emphasis added).

- The Defendant <u>knew</u> and never disclosed to this Court, that Dr. Lehrke would <u>not testify</u> to support the opinion about custody and visitation that she stated in her affidavit (p.38, lines 10 to 25, Lehrke Transcript December 19, 2000);

- The Defendant <u>admitted</u> in his testimony that he would have returned the children if the Plaintiff had renounced home schooling; therefore <u>all</u> the other issues he stated in his *exparte* motion declaration <u>were not only not an urgent matter, but in fact had no real substance</u> (p.187 lines 18 to 25, Remis Transcript, December 13, 2000);

- Home schooling in itself was not an urgent matter as the Defendant had known that issue in April 2000 before taking the children for visitation in Canada on June 9, 2000 (see Exhibit 5);

Therefore there <u>was no need for **any** immediate relief</u> for the defendant justifying the use of any special proceedings.

### ii) Complication of procedures for the Plaintiff because of the Defendant's action:

The actions of the Defendant have triggered a number of otherwise unnecessary procedures for the Plaintiff under the Hague Convention in Canada, Hawaii and

California. This has led to the judgment declaring the international abduction of the

children (Exhibit 13), a motion to decline jurisdiction in the Family Court of Hawaii,

a petition under the Hague Convention to the U.S. District Court of Hawaii and appeal to

the 9th circuit Court of Appeals.

The Defendant placed the Plaintiff in a position where she had to litigate in different

courts in order to assert and protect her rights under the1994 Hawaii stipulated

judgments which stated that:

> "should consent/consultation not be reached, and furthermore  on all matters
>
> concerning this judgment, any decision should be subject to the determination of a
>
> court of competent jurisdiction in the country in which the Mother and the child
>
> are residing,  taking into consideration the best interest of the child." (Exhibit E-1
> and E-2, Stipulated Judgment p.7) (Emphasis added).

Furthermore, Defendant by his actions directly and deliberately breached the 1994

stipulated judgment.

The best interest of the children could not justify the petitioning of the Hawaii court

because the same result (the temporary physical and legal custody order) could have been

obtained by petitioning the Canadian Family Court in the same time frame (from June 9,

2000 to August 5, 2000).

On the other hand, what it did do was to create more procedures, more confusion, more

delay, contributed to alienate the boys from their Mother, and incurred more costs

for Plaintiff and deprived the Plaintiff of a custody hearing in Canada which is the

proper Forum according to the Hague Convention, the Jurisprudence, and the 1994

Hawaii stipulated judgment.

**5) The November 20, 2000, Report of the Custody Guardian Ad Litem, Marinita Lopez, Esq.,**

**a)The Custody Guardian Ad Litem report should not be considered by this court as evidence to determine the "grave risk"issue for the following reasons:**

**i)The Custody Guardian Ad Litem is an attorney for the children and is bound by the Hawaii rules of professional conduct:**

Rule 1.2 Scope of Representation

"A.) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraph (C), (D) and (E), and shall consult with the client as to the means by which the objectives are to be pursued. A lawyer shall abide by a client decision whether to accept an offer of settlement of a matter..." (Michie's Hawaii Revised Statutes annotated, court rules, 2001 edition p.853). (Emphasis added).

Rule 1.14 Client Under a Disability

"A.) When a client's ability to make adequately considered decisions in connection with the representation is impaired, whether because of minority, mental disability or for some other reason, the lawyer shall as far as reasonably possible, maintain a normal client-lawyer relationship with the client." (Michie's Hawaii Revised Statutes annotated, court rules, 2001 edition p. 881). (Emphasis added).

Comments on rule 1.14

"Nevertheless, a client lacking legal competence often has the ability to understand, deliberate upon, and reach conclusions about matters affecting the client's own well-being. Furthermore, to an increasing extent the law recognizes intermediate degrees of competence. For example, children as young as five or six years of age, and certainly those of ten or twelve, are regarded as having opinions that are entitled to weight in legal proceedings concerning their custody...." (Michie's Hawaii Revised Statutes annotated, court rules, 2001 edition, p. 881 comment line 6). (Emphasis added).

As previously stated above in this case, the children have been influenced under parental alienation to take sides with the Defendant in the custody proceedings.

They have on many occasions voiced that they wanted to stay with the Defendant (see Videotape, Dr. Lehrke's testimony, Defendant's testimony and Custody Guardian Ad Litem report). This decision (even if wrongfully <u>influenced</u> by parental alienation) has been given to the Custody Guardian Ad Litem attorney <u>who has no other choice</u> according to the rules of professional conduct <u>than to endorse and support what the clients (children) express</u> and to make representations accordingly.

This makes the Custody Guardian Ad Litem report and testimony <u>"biased"</u> because of the legal obligation to "abide by the client's (children's) decisions concerning the objectives of representation." She could <u>not have</u> any other conclusion without breaching Rule 1.2 on Scope of Representation.

**ii) In this case the custody guardian ad litem is an attorney to a child in a custody case:**

The order appointing the Custody Guardian Ad Litem states:

> "Good cause appearing, IT IS ORDERED that pursuant to HRS Sections 560-5:-105, 571-8.(5), 571-24, 571-46(8), 571-47, 578-17, 584-9, 587-34 <u>and/**or**</u> HFCR 17 (c) and 152, the person indicated above be appointed guardian ad litem to <u>protect the interest</u> of the minor child named above until final disposition of the case or unless sooner discharged by the court subject to the "Duties of a Guardian Ad Litem (GAL)" set forth on the reverse of this Order Appointing Guardian Ad Litem and incorporated herein.
>
> (..)
>
> (5) Appear at all court hearings to represent the <u>child's interest</u>, providing testimony when required; and (..)"
> (Exhibit C-8, Order appointing Custody Guardian Ad Litem) (Emphasis added).

The Custody Guardian Ad Litem in this case has been appointed according to the family court rule HFCR 17 (c) because it is <u>not</u> a "child protective case" but a "child custody case"

HFCR 17 (c) states:

> "(c) *Minors or incompetent persons*. The court may appoint a guardian ad litem for a minor or incompetent person <u>not otherwise represented in an action</u> or shall make such other order as it deems proper for the protection of the minor or incompetent person."

### iii)The Custody Guardian Ad Litem has based her recommendation on Dr. Lehrke's report which Dr. Lehrke admits cannot be relied upon:

As previously pointed out, Dr. Lehrke would <u>not make</u> any recommendation or opinion

about custody and visitation <u>even after reading the Custody Guardian Ad Litem report,</u>

which show obviously that her report has no professional foundation

> "Q. But you felt that the custody guardian ad litem seems to have…you've read her report, I take it?
>
> A. <u>I've read her first report.</u> I don't know if there were any other reports.
>
> Q. No, there are not, that….that I'm aware of.
> The…<u>you feel that your testimony will…you doubt that it'll shed new light because she seems to have obtained all the same information independently from the same sources.</u>
>
> Do you see that?
>
> A. <u>Yes."</u>
>
> Q. Okay. And do I take it then the bottom line for you when you wrote this letter (1) is <u>you don't understand really why anybody needs you to testify at all?</u>
>
> A. <u>That's right."</u> (p.45, lines 11 to 25, Lehrke Transcript, December 19, 2000). (Emphasis added)

(1) See letter Exhibit C-7

**iv)The Custody Guardian Ad Litem has no psychological expertise, nor did she obtain consultation from an expert other than Dr. Lehrke for her report and testimony:**

The limitations applicable to Dr. Lehrke's work are binding on the Custody Guardian Ad Litem's report and testimony because Dr. Lehrke was the only professional consulted for any mental health input in this entire case.

> "Q. And nonetheless just as a general thing, you would defer to anybody who was appointed as a custody guardian ad litem to..to make a custody recommendation based on what?
>
> A. Well, if they do a proper evaluation I would defer to them.   But they usually would be consulting with me so they would have mental health input when …as part of their evaluation.  In this case, um, the custody guardian ad litem did consult with me and so she did have mental health input.
>
> Q.  Well, I…I'm having difficulty. Have mental health input, which you've given is not an opinion, it's not a custody evaluation, and you have not done a comparative custody assessment or evaluation, and yet she has mental health input.  Isn't the limitations that you have expressed to….to your work  if the custody guardian ad litem in this case is using  you as her mental health professional is limited to her as it is to you?
>
> A.  Well, she's not limited to consulting with me. She could consult with other mental health personnel if she wants to. She can refer the children into treatment with someone else if she wants to."
> (p. 70, lines 5 to 25, Dr. Lehrke Transcript, December 19, 2000).
> (Emphasis added).

**v) The only other evidence that the custody guardian ad litem could rely on is the version of her clients (the children) and the Defendant, which is not sufficient evidence because both may have a biased position against Plaintiff and in any event there is no valid psychological expertise to evaluate this family and the truth:**

The Custody Guardian Ad Litem has testified that she does not have psychological

expertise and that no other expert other than Dr. Lehrke has been consulted.


And regarding the children's and the Defendant's version of the truth Dr. Lehrke stated:

> "Q. Okay, and you're not a…okay. So you're not able to …also you're not able to tell then whether they're telling you the truth?
>
> A. Of course.

Q. Okay, and does that include the fact that you're not able to tell if the Father was telling you the truth?

A. Of course "(p. 69, lines 4 to 11, Dr. Lehrke Transcript, December 15, 2000.) (Emphasis added).

## vi) The report of the Custody Guardian Ad Litem is biased, incomplete, contains hearsay and relies on no valid expertise of any kind at all.

The Custody Guardian Ad Litem in this case relied mostly on Dr. Lehrke's report. For

the reason mentioned above, the incompetent report/ affidavit of Dr. Lehrke should

be stricken by the Court.

Because no other valid expertise was utilized to support the Custody Guardian Ad Litem

report, it should not be given any weight in this case. All the other evidence gathered by

the Custody Guardian Ad Litem is hearsay (teacher) and biased (children and Defendant).

No proper attention has been given to the Plaintiff's version, nor to Pastor Paul Pelletier

and Mr. Makenzie, supporting the conclusion that the Custody Guardian Ad Litem is

biased in this case in seeking only to please her client's wishes (influenced by the

parental alienation of the Defendant). She even went so far as to acknowledge that she

continued to rely on Dr. Lehrke initial affidavit notwithstanding Dr. Lehrke's withdrawal

of the efficaciousness of that affidavit in testimony the day before.

Further example of bias of the CGAL relates to her summary Mrs. Shaner (CPS social

worker) comments to the effect that the mention of the possibility of any abuse in Quebec

could had been different if she had talked to the Mother. Further the investigation "cited"

by the CGAL was merely to verify the existence of any broken windows at the Plaintiff

house which two local witnesses have never seen (Pastor Pelletier and the next door

neighbor Mr.Mackenzie).

Concerning the <u>video tape:</u> it was made at least 6 months after the children were no more in the physical custody of their Mother. Only parental alienation can explain how they could react this way <u>after being separated from her for so long</u>.

Parental alienation has not been investigated by the Custody Guardian Ad Litem, even if her only supposed source of expertise (Dr. Lehrke) gave all indication that it could apply in this case but did no investigation concerning it, leaving it all to the "Custody Guardian Ad Litem" who in turn did nothing.

> Q. And at this point, are you in a position to tell the Court <u>whether you found anything on Mr. Remis' part to cause this alienation from the mother?</u>
>
> A. I didn't find anything, <u>but that's not conclusive because really I did not do an investigation."</u> (p.23 lines 4 to 12, Lehrke Transcript, December 19, 2000). (Emphasis added).

As to the value of the Custody Guardian Ad Litem report for the determination of "grave risk" in this case, the main "source" of the report, Dr.Lehrke, seems not to be convinced of "anything" after reading it.

> A. well, I - - I thought about that in November, I thought about it <u>after I read the custody guardian ad litem's report</u>. I've thought about that at various points. <u>I really don't have opinions about the overall situation at this point</u> because I feel that that's the job of the custody ad litem, to look at it from all angles and - - and say what's really going on here. (p.52 lines 2 to 8, Lehrke Transcript, December 19, 2000).

Dr Lehrke, and the CGAL are "bootstrapping" off each other, and neither is doing a proper assessment.

> Q. All right. Well, in order for you to arrive at the conclusions you did, isn't it appropriate under the canons of ethics of the American Psychology Association that you have talked - - that you would have <u>talked to the mother?</u>
>
> A. Not if there is going to be a custody guardian ad litem doing an investigation. <u>I don't need to take on that role</u>. That would be a double investigative role and <u>I was not doing a forensic investigation in this case."</u>
> (p. 58 lines 3 to 10, Lehrke Transcript, December 19, 2000) (Emphasis added).

56

## III. CONCLUSION

**The non-return of the children to Canada under the Hague Convention would be an endorsement of the Defendant's breach of the following laws and principles:**

1.) The Hague Convention article 3 (Exhibit A):

> "The removal or the retention of a child is to be considered wrongful where
>
>> a)  it is in breach of right of custody attributed to a person…."
>> (Emphasis added).

2.) The Canadian court decision on August 22, 2000 (Exhibit C-1).

3.) The Canadian court decision on November 23, 2000 (Exhibit C-2):

> "We acknowledge that the child, Andreas Wailani Remis, born on June 23, 1992 and the child John Anolani Remis, born on September 17, 1990 have been the object of an international abduction (wrongful removal or retention)… according to the article 3 and 5 of the Hague Convention on the civil aspects of international child abduction." (Emphasis added).

4.) The finding of Judge King's decision on the following matter:

> "Petitioner has established as a threshold matter that retention of the children by Respondent was "wrongful" for purposes of ICARA and the Hague Convention" (Order p.11) (Emphasis added).

5.) The International Child Abduction Remedies Act (ICARA) 42 USC 11601 sec 2  A (2) (Exhibit B):

> "Persons should not be permitted to obtain custody of children **by virtue of** their wrongful removal or retention." (Emphasis added).

6.) The Hawaii 1994 stipulated judgment:

> "…and furthermore on all matters concerning this judgment, any decision would be subject to the determination of a court of competent jurisdiction in the country in which the Mother and the child are residing…" (Exhibit E-1 and E-2, p.7 article 6) (Emphasis added)

> " A. Relocation: The father hereby consents to the relocation of the mother with the child to Canada." (p.2 article 2) (Emphasis added).

**7.)**  The abuse of process of the family court rules on special proceedings (ex parte motion):

> HFCR Rule 65 (b) " - - - when it clearly appears from specific facts shown by affidavit or by the verified complaint or cross-complaint that <u>immediate</u> relief to the applicant is appropriate. - - -." (Emphasis added).

**8.)**  The jurisprudential outline by the United States court of appeals for the  sixth circuit in its  decisions re  Friedrich vs Friedrich, which is the leading case on the Hague Convention in the United States that includes the following principles:

<u>a)</u> Concerning the grave risk exception:

> "All four of these exceptions are 'narrow' 42 U.S.C. 11601 (A) (4). They are not a basis for avoiding return of a child merely because an American court believes <u>it can better or more quickly resolve a dispute.</u>" (p.5 Exhibit P ); (Emphasis added)

<u>b)</u>  Concerning custody matters:

> "The exception for grave harm to the child is not a  license for a court in the abducted-to country to speculate on <u>where the child would be happiest.</u>  That decision is a custody matter and reserved to the court in the country of <u>habitual residence</u> (p.6 Exhibit P) (Emphasis added).

<u>c)</u>  Concerning the ability of  a foreign court:

> "In thinking about these problems, we acknowledge that courts in the abducted from country <u>are as ready and able as we are to protect children;</u> if  return to a country or to the custody of a parent in that country <u>is dangerous,</u> we can expect that country's courts to respond accordingly." (p.6 Exhibit P )(Emphasis added).

<u>d)</u>  Concerning "grave risk":

> "…we believe that a grave risk of harm for the purpose of the convention can exist in only two situations. First, there is a grave risk of harm when return of the child puts the child in <u>imminent danger</u> prior to the resolution of the custody dispute e.g., <u>returning the child to a zone of war, famine, or disease.</u>  Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, <u>when the court in the country of habitual residence,</u> for whatever reason, <u>may be incapable or unwilling to give the child adequate protection.</u>" (p.7 Exhibit P )(Emphasis added).

Therefore in light of the newly discovered evidence and the misrepresentations made to this Court, Plaintiff asks this Court to vacate the December 11, 2000 Order and order the return of the children to Plaintiff.

Plaintiff requests that Defendant be responsible for all the necessary expenses incurred by or on behalf of Plaintiff, including travel expenses and all the costs of legal representation including attorneys' fees in Canada and United States and the costs for the returning of the children and costs.

Dated: Honolulu, Hawaii, _____ DEC 7 2001 _____.


_____
PAUL A. LYNCH
Attorney for petitioner

59