<u>MEMORANDUM IN SUPPORT OF MOTION</u>

## I.
## INTRODUCTION

The fact of the matter is that the Petitioner has as of August 22, 2005, "won" the case.  She had at that point validated all of the prerequisites to her request for relief in the petition, the relief merely being the one thing for which the Hague Convention was created in the first place and which was endorsed by the ICARA legislation passed by the United States Congress, to-wit the return of any wrongfully abducted and/or retained children to their place of habitual residence, such that if there were to be any contested custody proceedings, they must occur in the place of the habitual residence of the children.  Habitual residence of the children in this case is admittedly and uncontrovertibly Quebec, Canada.  Thus, for all intents and purposes, the only purpose of this proceeding is to complete the processing of the petition and to allow the Defendant to prove an Article 13(b) defense of grave risk of physical or psychological harm by clear and convincing evidence if he can, which was asserted in the first instance in the year 2000, failing which to then see whether there is any other defense under Article 13 that the Defendant may prove in order to have the Court not order the return of Andreas Remis to Quebec Province for whatever proceedings might take place thereafter, if

any.

The Court has obviously noted that the Ninth Circuit Court of Appeals in Gaudin III (Gaudin v. Remis, 415 7.3d 1028 (CCA9 2005), hereinafter "Gaudin III"), has mandated that in dealing with the balance of the case and any defenses asserted under Article 13 by the Respondent that there is to be no deferral of any kind whatsoever to the fact of any state proceedings having taken place in the intervening 6 years (now 7).

As a matter of fact, it should be noted again and again and again that this is not a custody proceeding:  AND ANY CONSIDERATION THAT MIGHT BE PERTINENT TO A CUSTODY PROCEEDING HAS NO PLACE WHATSOEVER IN THIS COURT.

As a result of the foregoing then, it is clear that there has not been a final custody proceeding relative to any dispute between the Mother and Father in this case, and it is the job of this Court to determine where Andreas Remis is to be, should there be a subsequent proceeding of any kind.

It is also to be noted therefore that Petitioner contends that the only result that is correct in this case, and as a result of this motion, is that the Court issue an order mandating the return of Andreas Remis to Quebec for all the reasons cited hereinafter.

II.

## STATEMENT OF POSITION

The format adopted by the Court for the hearing mandated by the last decision of the Ninth Circuit Court (Gaudin III, *supra*) should be stricken for the following reasons:   This was to be an evidentiary hearing of one fashion or another relative to the existence and facts of an Article 13 defense proffered by the Respondent.   To that end, it is inappropriate for there to be declarations submitted as and for direct testimony.   What might be appropriate as an offer of proof during the conduct of a trial for purposes of argument, on an objection having been made in order to assist the Court as to whether to sustain or overrule the objection and provide a record or basis for an appeal, it is not applicable to this proceeding.   The declarations are in fact loaded and replete with all kinds of information and assertions that if attempted to be elicited by direct questioning on the stand would be subject to objection, the sustaining of which would keep out almost all of it. This relates to the fact that considerations of matter that would relate to a determination of custody is stated throughout the material and intended to be there, as it has been one of the consistent tactics of Respondent and his counsel to put in material that they know or should know is not admissible and is extraneous for the purpose and conduct of the proceeding.   For that reason, all declarations

4

should be struck.

For the same reason, the submission of proposed Findings of Fact and Conclusions of Law before one even knows what the contentions of the opposing party are is an exercise in crystal-ball gazing and really becomes part of the argument made in a Trial brief, and is objectionable for that reason. If the Court wishes assistance in the drafting and adoption of findings of fact and conclusions of law at the conclusion of the proceeding, it can ask for same and at that point in time, it can be prepared with the focus on what actually took place in the courtroom rather than making argument in advance. For that reason, Petitioner objects to the use of proposed findings of fact and conclusions of law. Some of the rationale recited shall be cited in detail below so as to make it crystal clear as to how inappropriately this document can and in fact in this case was used by the Respondent.

For the same reason, all the declarations should be stricken and testimony should be elicited live in the courtroom, if a proceeding is ever held in view of the legal deficiencies of the Respondent's position. After all, although it can be said that a proceeding tried by the Court without a jury can be subject to more lenient rules of evidentiary admission because of the Court's sophistication, it is a fallacy when it comes to the reality of not being able to "unring the bell". Since the

5

beginning of this case, the Respondent and his attorney have attempted to keep on mentioning all kinds of things relative to how much the boys do or don't like their father, how much do or don't like their mother, how much they enjoy the activities with their father, how much they like Hawaii, all of which are factors that don't have anything to do with the Hague Convention proceeding. In fact, a major mistake of Petitioner's counsel in December of 2000 was to assume that the Court knew, or would become knowledgeable of the law, such that it did not make any difference if there was a grave risk of psychological harm where there was no attendant physical or sexual harm, as the requirement for doing an undertaking would automatically mean that the judge would send the boys back to Quebec.

Lastly, the Petitioner is asking the Court to dismiss outright as a matter of law the use or availability of an assessment of age and maturity for the reason that even looking at this so-called "standard" is an impermissible infringement of the exercise of the Petitioner's religious freedom and could be viewed additionally as a preference of the religion of secular humanism over Christianity.

Also, because of what has been shown thus far, Respondent will be unable to demonstrate sufficient age and maturity in Andreas Remis' stated preference of geography for purposes of this case.

Petitioner further notes that this case thanks to the maneuverings of the

6

Respondent in throwing up irrelevant material in attempted roadblocks, and with the assistance of the judicial system, has become much more about the running of the clock than it has been about sustaining the legitimate rights of the Petitioner. By all appearances, Mr. Remis has played the judicial system for the past six years and frustrated the sole purpose of the Hague Convention. In pleading after pleading, Mr. Remis sought not to defend his abduction, but rather to postpone judgment until the legal authority of the Convention expired. John Remis is now 16 and the Convention is no longer applicable to him.

Andreas, the younger son, is now 14. This Court has an equitable responsibility to Ms. Gaudin to disallow frivolous arguments that extend the length of this case and once again penalize the mother for the father's wrongdoing. If the Court does not rule immediately, then it has abetted the Respondent in thwarting the express purpose of the Convention: the <u>expeditious</u> return of children. What was intended to be six weeks is now coming up on seven years. This is unconscionable.

Further and lastly, Petitioner won her case in the year 2000. An attempt to straighten that out was ignored by all courts concerned, notwithstanding the boys should have been returned to Quebec in 2001. A proceeding in Quebec for a change in custody, if there had been one, would long have been over and if taking

place now in the near future would also be over in fairly short fashion on an

expedited basis and therefore given that there has been intentional wrongdoing in

this case on the part of or on behalf of the Respondent, the Court should flat out

declare that Andreas will return to Quebec for whatever proceedings Respondent

wishes to initiate, and that Petitioner should be awarded her fees and costs from

day one.

III

THE REMAND

A.  ARTICLE 13(b)

Citing from Gaudin III, at page 1036:

"Whether the children are better off with their father (Remis) or their
Mother (Gaudin) is a matter for custody determination, and the Hague Convention
and ICARA dictate that custody must be determined by the home jurisdiction - in
this case, Canada- unless the existence of a grave "risk" truly renders that
impossible." (Emphasis added).

The Explanatory Report of the Hague Convention, which is afforded

substantial authority in Hague cases, asserts that  "...substituting the forum chosen

by the abductor for that of the child's residence, would lead to the collapse of the

whole structure of the Convention by depriving it of the spirit of mutual

confidence which is its inspiration."

8

Elisa Pez-Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session 426 (1980).

As it has been made clear by the Ninth Circuit, Canada and not the United States, is the proper home jurisdiction. In Gaudin III, at 1036, the Ninth Circuit advises that, "Necessarily, the 'grave risk' exception considers, inter alia, where and how a child is to be returned." The matter before us then is first to determine if, in the return to Canada, does a "grave risk" exist and then does it truly render the return to Canada impossible.

The Ninth Circuit Court also enlightened us to the fact that we need not evaluate the merits of whether harm existed in 2000. We need only look at whether harm now exists, and if so, can the risk be minimized through alternative remedy.

To determine or to discount whether a grave risk of harm now exists, once again we heed the advice of the Ninth and remark that the grave risk exception to the return remedy was like the other exceptions, "drawn very narrowly lest their application undermine the express purposes of the Convention — to effect the prompt return of abducted children." To provide context, the U.S. Department of State's Legal Analysis of the Hague Convention (51 Fed. Reg. 10494 (1986)) prepared for the Senate Committee on Foreign Relations to which the Convention

was referred, confirms the intention that Article 13 was intended to be afforded a narrow interpretation. In this regard the State Department stated that the drafters "were aware that any exceptions had to be drawn very narrowly lest their application undermine the express purposes of the Convention — to effect the prompt return of abducted children"; that "it was generally believed that courts would understand and fulfill the objectives of the Convention by narrowly interpreting the exceptions" that Article 13(b) "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests" and that "[o]nly evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." (Emphasis added).

So as to better identify what grave risk entails so that this Court can determine whether it actually exists we now have guidelines as to what should and should not be considered.  A review of the case reveals that they are:

1.    If a grave risk of harm exists, it must relate to the child's return to Canada.

2.    If a grave risk of harm exists, it must exist in the now.

3.    If a grave risk of harm exists, it must be drawn very narrowly.

In order to further identify what the great risk of harm is allowed to entail, the Ninth Circuit added the following considerations:

10

4.    The risk must be grave, not merely serious.

5.    The risk must be proven by clear and convincing evidence.

6.    The risk cannot be cumulative; it should be only concerned with the degree of harm that could occur in the immediate future. For purposes of the Hague, immediate future refers to the period of time to contest a custody hearing in Canada.

The Ninth Circuit stated explicitly that no weight shall be given to the fact that a custody proceeding has taken place in Hawaii. For purposes of determining if a great risk of harm now exists, that would rule out all materials pertinent or related to the custody proceeding past or, for that matter, any custody proceeding future. With this and the above all in mind, it is reasonable to conclude that having reviewed the declarations by Remis Jr., Deering, John Remis, Andreas Remis, and the proposed findings of fact by Remis, all which have nothing to do with above six points, that they are peripheral and frivolous to the determination of grave risk as proposed by the ninth Circuit. Therefore, they should be struck as irrelevant to the proceedings.

As stated, the appellate Court advises that: "Necessarily, the 'grave risk' exception considers, inter alia, where and how a child is to be returned." To add further clarity, the Petitioner states that so as not to complicate Andreas' life

11

further than necessary, the Petitioner requests that her son be allowed to finish schooling this semester and then be returned to Canada for a final determination of custody that could be completed shortly, if necessary.

The case law demonstrates that to sustain his burden under the Article 13(b) exception, Remis must show that, if the children are returned, the risk of physical and psychological harm is "grave," which is said to be "a great deal more than minimal," Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000), and "more than serious," Danaipour, 286 F.3d 1, 4. The First Circuit has explained away other things that:

> "... the harm must be 'something greater than would normally be expected on taking a child away from one parent and passing him to another;' otherwise, the goals of the Convention could be easily circumvented." Walsh, 221 F.3d at 218.

The First Circuit has also cautioned that "[t]he Article 13(b) defense may not be used 'as a vehicle to litigate (or relitigate) the child's best interests.'" Danaipour, 286 F.3d 1,4. Thus, in determining whether the petition for return ought to be granted, the task is not simply to determine where the child would be happiest or who would be the better parent. Walsh, 221 F.3d at 218; see also Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996).

In Friedrich v. Friedrich, at 108, the Court of Appeals for the Sixth Circuit

12

considered the mother's contention that returning her son to Germany would cause him psychological harm and observed: "The exception for grave risk of harm is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence." In other words, the test is not one of "best interests," and the case is not a "custody case." The standard is much higher — there must be a serious risk of harm to the child — if return is to be denied.

Further, a grave risk of harm is not "established by the mere fact that removal would unsettle the children who have now settled in the United States. That is an inevitable consequence of removal." <u>Walsh</u>, 221 F.3d at 220 n.14. "<u>A removing parent must not be allowed to abduct a child and then – when brought to court – complain that the child has grown used to the surroundings to which they were abducted. Under the logic of the Convention, it is the *abduction* that causes the pangs of subsequent return.</u>" <u>Friedrich</u>, 78 F.3d at 1068. (Emphasis added).

In <u>Belay v. Getachew</u>, a mother abducted her child from Sweden to Colorado and concealed her whereabouts. The father searched for three years before he located them and filed for a return under the Hague Convention. The Court determined that the mother wrongfully removed the child, but that she had established that the child was well settled in its new environment. The Court held

13

that although the mother had established the "well-settled" defense, equity mandated that the child be returned because the child only became well settled as a result of the mother's concealment of their whereabouts.  The Court held that to allow an article 12 defense would warp the intention of the Convention by rewarding behavior its specifically seeks to deter. _Belay_ v. _Getachew_, 272 F.Supp. 2d 553 (D.Md. 2003).

The First Circuit has cautioned that "[t]he Article 13(b) defense may not be used 'as a vehicle to litigate (or relitigate) the child's best interests.'" Danaipour, 286 F.3d 1,4. Thus, in determining whether the petition for return ought to be granted, the task is not simply to determine where the child would be happiest or who would be the better parent.  Walsh, 221 F.3d at 218; see also Friedrich v. Friedrich, 78 F.3d 1060, 1068 (6th Cir. 1996).  The Convention is designed to ensure that those and other issues underlying the custody dispute are presumptively to be adjudicated in the place of the child's habitual residence.

To allow instances of the above would effectively contravene the intent of the Convention as it would allow the wrongdoer to, "by weight of paper," run out the clock.  It deserves repeated mention that this case should have been properly determined in 2000 when John was 9 and Andreas, 7.

It is a matter of record that frivolous litigation has benefited the wrongdoer.

14

So as to avoid the inexpiable, introduction of custody material, the Court should adhere to the narrow interpretation of Grave Risk of Psychological Harm. The reason given complements the express purpose of the Convention to effect the prompt return of abducted children.

The Hague Convention and the ICARA were specifically designed to discourage those who would remove or retain children in the hopes of seeking a "home court advantage" by ensuring that children wrongfully removed or retained would be returned to their place of habitual residence so that custody determinations are made there. By invoking the treaty's exceptions in this case, what Remis has sought and still seeks by unilateral disdain is a determination of Inadequacy of Gaudin as a parent. This falls squarely within the "forbidden territory" of deciding the merits of the parties' custody dispute. Friedrich, 78 F.3d at 1065.

As it is impossible to extricate the content pertaining to the "forbidden territory" from the declarations of Deering, and John Remis Jr., the proposed findings of fact by John Remis Jr., Petitioner demands that they be stricken in their entirety.

As to what should be considered, the Ninth Circuit stated that the Grave Risk of Psychological Harm must exist. Therefore, what is asserted as evidence of

15

harm need pass a temporal test. It must be based upon recently demonstrable acts of which the Grave Risk of Psychological Harm need be a direct and immediate consequence. This is spelled out by the Ninth Circuit in Gaudin III at pages 1036 and 1037. The Court was directed not to defer to the findings of the Hawaii State Courts. Therefore, the Court cannot accept the presumption that harm occurred in the past, in order to make a determination (and in fact and law, as spelled out hereinbelow there was none). Andreas has not been in the custody of his mother since 2001. If she has not been in physical proximity to do harm, then the harm alleged must be by means of agents of influence, either persons or things. As asserted by the father, the only communication between Andreas and his mother since 2001 has been religious pamphlets with a small post-it note. Absent any other means or method, the reading of these religious pamphlets or the reading of the small post-it note must be the vehicle by which grave risk of psychological harm is conveyed. Unless the Court is willing to entertain the possibility of extrasensory powers (ESP).

The suggestion of ESP is not meant to be sarcastic to the Court. It is the only possible conclusion that one can draw other than that the text of the pamphlets or the note contains a grave risk of psychological harm. Citing the text: Jesus said, "...I am the way, the truth, and the life; no man cometh unto the Father

16

but by me." (Respondent's Exhibits D1 and D2).

Pornography can be asserted to cause a grave risk of psychological harm. So far as this counsel has been able to determine, no Court has ever found that it causes any. The reading of the Bible has risk of psychological harm. Throughout the history of this case there have been constant aspersions upon Gaudin's religious belief. Gaudin has been accused of wanting to turn Andreas into a "Good Christian Soldier." Never has anyone declared why that would be harmful. If the Respondent contends that teaching a child to be a "Good Christian Soldier" is a grave risk of psychological harm, then it is incumbent on the Respondent to assert this comparison and Its basis In fact, science, law, or religion.

To the extent that exposure to his mother is asserted to be a grave risk of psychological harm, it is not demonstrable. An expert cannot claim this risk without citing predicate. If the Ninth Circuit states that the Court can only concern itself with "now," the father cannot introduce assertions of the past. The feelings of an 8 year old are not relevant now. The 8 year old is now 14. The Respondent has provided no evidence that the circumstance of 2000 will be the same on return. The Respondent has never provided any evidence that either in 2000 or now did Gaudin present a grave risk of psychological harm to either John or Andreas.

17

The declaration by Dr. Pamela Boyer Merez, Psy.D., does not indicate that Gaudin presents a grave risk of psychological harm. She does not state that relocation to Canada for the purpose of determining custody presents a grave risk of psychological harm. She does not state that separation from the Respondent presents a grave risk of psychological harm. She does state that "separating the brothers would have a negative impact on Andreas' mental health, and would put him at grave risk of psychological harm," but It Is not due to his relationship to Petitioner, his return to Canada, etc. It is due to the consequence of removal that takes place in any return. Walsh, 221F.3d at 221.

The declarations of John and his brother Andreas are very troubling. Words, phrases, sentences, paragraphs, the declarations are content and context-wise interchangeable. Not only do John and Andreas share the same recollections, they express them in the exact same way, word for word. Once again, unless the Court is willing to entertain the paranormal there are only two explanations: The brothers either wrote the declarations together or they copied them together. If they copied, then who provided the original text?

The declarations are of dubious origin. If written together, they discount their maturity. If copied from a provided text, then it is a deliberate attempt to mislead the Court. In either case it is now impossible to determine the boys'

18

independent opinion. The Court can never be certain if these declarations or any future declaration were not dictated or coerced. Furthermore, all expert opinion based upon interviews or observations of the children are suspect. The Court cannot discount the possibility that they were coached, now or at all times since 2000. They are children. While it would be inappropriate to question the boys' honesty, the Court can and must judge their credibility. Both declarations must be struck.

IV

DECEPTION AND DELAY

There has been deception and delay by the Respondent in this case from the outset to the present time. Back in December 2000, and prior thereto, there was conduct on the part of the Respondent as declared by a Canadian Court and affirmed by this Court that he engaged in wrongful conduct for purposes of the Hague Convention in his retaining the children and not returning them to their mother at their habitual place of residence at the end of a summer visitation. The Court noted in its decision dated December 11, 2000, as did the state Family Court in its order of September 25, 2000, the reliance on, among other things (but nonetheless a primary reliance) an affidavit of a psychologist, Sue Lehrke, which was submitted in support of the Ex Parte Motion for Temporary Restraining Order

19

and cited by the Honorable Samuel P. King in his decision, that there appeared to him to be by clear and convincing evidence a grave risk of psychological harm in this case. It subsequently transpired and came to light that that psychologist recanted her assertion and opinion that returning the boys involved in this case to their mother in Quebec would cause substantial damage to their mental health. She not only denied that she expressed an opinion, she recanted it and testified under oath that she never indicated that they could not go back to their mother. Insofar as she was concerned, they could go back to their mother. She "would probably recommend therapy. . .." See Rule 60(b) motion, Exhibit _/_ submitted to the Court in connection with the presently pending remand hearing, to-wit the Rule 60(b) motion submitted to this Court in December of 2001, and never entertained or heard by the Court, the only circuit court in the United States where that could be the case. An examination of the content of the Rule 60(b) motion would reveal that the affidavit was not only erroneous, deceptive, if not down right intentionally false, but that it certainly meets the definition of the word frivolous as a ground for assertion of grave risk of psychological harm. The point here is that it not only was it false, the point is that it also set the tone intended for everything that has been done by the Respondent and his attorney from the beginning of this case to the present time.

20

The Court needs to be aware of the fact of that having happened notwithstanding the Ninth Circuit's admonition that they don't know whether there was grave harm originally back in 2000 and therefore they did not pass on it or what undertaking could have or might have ameliorated any harm that existed. Counsel for Petitioner is stating here and now as he did in the Rule 60(b) motion that was never heard that there was <u>never</u> any grave risk of psychological harm and that the frivolous and false affidavit which was the cause for the boys being retained in Hawaii and in fact kept in Hawaii from the outset until now.  Counsel for Petitioner asserts not only by virtue of the opinion of the Ninth Circuit dated August 22, 2005, has Petitioner won, but that she also won in the sense that the boys absolutely and without argument should have been sent back by any decision rendered on December 11, 2000, there being no considerations to the contrary.

Secondly, underlying the proceedings in connection with the case in the year 2000, there have been numerous, wanton and scandalous attacks on the religious beliefs of Petitioner, and the fact of her having any by the Respondent, a lawyer, and by his lawyer.  Because both of these persons are lawyers, it is to be presumed they know enough about the law to know what is pertinent to a custody proceeding and what is pertinent to religious freedom, such that the sneering disdain with which they describe her beliefs and speech should not be tolerated,

21

see e.g., the affidavit submitted by the Respondent in connection with his ex-parte application for temporary restraining order and submitted to the federal court relative to bible reading, salvation, etc.

As a further example of deceptive and delaying tactics, just prior to the oral argument on the first appeal to the Ninth Circuit, Respondent filed a motion to dismiss the appeal on the ground that it was moot with no citation of authority for the circumstances presented here.

A tactic that has been used throughout this case of putting up propositions of law with no supporting citation of authority, e.g., arguing *res judicata* to the CCA9 panel handling the appeal on the merits in January 2005, was used again on February 13, 2007, at the proceedings on that date as is spelled out further below. The Ninth Circuit rendered a judgment dated August 22, 2005, and what is now known as Gaudin III, supra, and at a status conference on September 9, 2005, counsel for Respondent demanded to know of Magistrate Judge Kobayashi as to "when they (Petitioner and her attorney) are going to stop?", referring to the fact that the case was still alive and that we were there because of the remand. The judgment that was rendered on August 22, 2005, by the Ninth Circuit, clearly enunciated the fact that time was short inasmuch as the older boy was going to turn 16 when the Hague would no longer apply to him in a little over one year, and

thus a remand hearing was to be held on an expedited basis. This was said to get a final determination of the case prior to September of 2006. Thus, it was that there were only 16 days between the rendition of that judgment and our appearing at the Magistrate Judge's request before her on September 8. When counsel for Petitioner ramonstrated that the proposal of appointing someone from the State CGAL list was objectionable – in the extreme – counsel were instructed to brief their position on what was to take place and to reappear before the Magistrate Judge on September 30th. On September 30th, the Magistrate Judge took the matter under advisement indicating that she would let us know shortly as to how the matter was going to proceed. The remark by counsel for Respondent's plaintive cry about when Petitioner was going to stop is cited by the undersigned as a true example of an attempt to characterize the efforts of a mother to obtain a return of her children after they were wrongfully abducted by their father as somehow, by the sneering tone in which the cry was delivered, inequitable or that for which she should be deprived. There was nothing from the Court and indeed the next activity in the case were Court Minutes on July 6 noticing a hearing on October 24th, more than a month after the older boy turned 16. Counsel for the Petitioner never received that notice, and the result is the position the case is in now.

The conduct of the Respondent and his attorney as outlined above has

continued more recently in what the undersigned considers to be a cynical attempt to pretend that there is an Article 13(b) defense related to "grave risk of psychological harm" by putting in declarations that are loaded with statements having to do with how much the children like each other and their father, how much they like sports, how much they like this and like that, including a declaration by an educational consultant relative to this kind of matters that have no bearing whatsoever to the Hague Convention proceedings and that all relate to items that might be mentioned in a plenary custody proceeding but have no place in this proceeding, and Respondent and counsel for Respondent know it. But they do it anyway to try to continue to influence the Court as they did originally with the discredited affidavit of the psychologist in the year 2000.

Yet a further example of this is as follows: In open Court on February 13, 2007, in this case when the Court asked a question about the immigration ruling of the Ninth Circuit in this case in the year 2004, and counsel for the Petitioner responded to the inquiry with an accurate recitation of what the contentions were and what the decision was, counsel for Respondent, see Transcript of Proceedings of this Court on 2/13/07 at pages 24 and 25, accused counsel for Petitioner of committing "fraud on the Court." This counsel now, as then, asserts that that statement by counsel for Respondent was frivolous and was designed to take

24

advantage of the Judge's apparent confusion.  Counsel for Petitioner states and asserts that it was frivolous for the simple reason that she participated in the briefing, she participated in all aspects of this case, she has read the decision of the Ninth Circuit, and she knew in no uncertain terms what the decision was and what it was based on, and not only impermissibly questioned the accurate portrayal of Petitioner's counsel of that issue in the Ninth Circuit and its ruling, but did so on purpose to take advantage of the fact that the Court was uncertain on some aspect of it.  Counsel for Petitioner states that she had to know that what she was saying was wrong.

Another example right now in this case of an attempt to mislead the Court is Respondent's proposed Findings of fact and Conclusions of Law.  In the declaration submitted by Dr. Merez in the form of a letter that she sent, as introduced by the Respondent, she states certain facts.  The proposed Findings of Fact and Conclusions of Law drafted by the Respondent and/or his attorney include numerous items of misrepresentation of fact as to Dr. Merez in view of the fact that they recite that Dr. Merez testified to things that she never had in the letter that was supposed to be her declaration and her direct testimony.  The attempt to influence anybody who read that, including the Judge, is obvious.  The disconnect between what is said that Dr. Merez testified to and what she in fact

was willing to testify to, as exemplified by her declaration, is sufficiently great for it to be obviously misleading and false. These are clear misrepresentations of fact. However, most importantly for purposes of the Court looking at deception in this case, where the conduct has been questionable at best throughout the case and in addition to those items mentioned hereinabove is this last revelation in the trial brief that the Respondent's attorney made intentional misrepresentations of the case fact, in order to make misrepresentations of the law. This citation on page 4 of the Brief is the England decision (England v. England, 234F.3d 268 (CCA 5 2000).

In the first instance it should be noted that the ability to even raise the assessment by the Court as to whether a child has attained an age and degree of maturity at which it is appropriate to take account of this news is not something that was even attempted at the point in time when this case originally came before this Court in December of 2000, when the boys' ages were 7 and 9. By the same token, the only reason that we're looking at a 14-year-old boy now is because of the wrongful conduct of the Respondent. In other words, this is not a case where the Court may be virtue of the circumstances of the parties who have matured at the time of the wrongful conduct examine the child with respect to its age and maturity as to whether it is appropriate to take account of its views. Rather, this is

a case where the wrongful conductor is attempting to take advantage of the law and his wrongdoing but by virtue of the passage of time alone to assert that because of age alone the Courts have passed upon whether the child is of sufficient age or maturity, that it is appropriate to take account of its views.

Given the admonition of the Ninth Circuit with respect to parental alienation, see footnote 3 at 1037, Gaudin III. Given the admonition of the Court as to the distinction between the child's views due to the fact that the child has been under the influence of the wrongful parent versus the independent mature decision of the child based upon his own maturity. Given the fact that there is an equitable tolling in the same situation with respect to the issue of whether or not a child is settled because of the filing of the petition beyond the one year period, then fairly obviously if there is wrongful conduct on the part of the Respondent, then the Court both as a matter of prudence and the law should refuse to even look at the issue, should refuse and should therefore immediately send the child back to his habitual place of residence in Quebec. His mother will be there.

Going back to the absolute outrageness of the extent to which the Respondent will go forth the law which was passed for the benefit of those parents who have custody and wherever they live. The case of *England v. England* is cited because of the apparent similarity of separating a younger sibling from an

27

older sibling because "it would be psychological to both girls to be separated by each other during the pendency of a custody proceeding" and on the basis of that conclusion, the law has said to have allowed both sisters to remain in the United States with their mother. This case is correctly cited as the last decision being the appellate court and the Circuit Court of the Fifth Circuit being 234 F.3d 268, and it is cited also for the proposition that a 13 year old was found sufficiently matured for the court to credit her desire to remain with her mother. This decision is absolutely misquoted 180E the opposite of what the actual decision reads. Under circumstances where the citation for the case would be with the correct appellate citation and the date means that the mistake is not inadvertent but is intentional and deliberate, and is fraud on the Court. A total misrepresentation of the results of the case. In addition, it cites a 13 year old was found sufficiently matured for the court. The child in that case was not 13 years old, another attempt by the Respondent and/or his attorney to have the Court compare the age of some child in an earlier case with the age one year older of the child in this case when the representation is false, and the basis is not on the age of the child in any event. The court should not countenance nor allow this kind of inappropriate, deceptive, misleading, misrepresentation of the law and done intentionally in any fashion whatsoever and should refuse outright to entertain the notion of not sending

28

Andreas Remis back to Quebec to his mother.

As the Ninth Circuit has pointed out, the period of time for which anyone would be concerned relative to a child in any way being upset by this location of moving and in any way being upset by the period of time in which they would have to reside with what is claimed to be the disfavored parent is not enough, not sufficient to overcome the presumption of the Hague, the purpose of the Hague and the benefit of the Hague. Furthermore, the amount of time is minimal and the thing has been dragged out immeasurably because of the misconduct of the Respondent and his attorney and it should cease once and for all.

As noted above on page 19, there exist serious doubts at to the authorship and authenticity of the declaration purported to be Andreas Wailani Remis. This dubious declaration and the falsified citation <u>England v. England</u> were meant to function in tandem. In the trial brief, Ms. Chang's conclusion leads with age and maturity. The Ninth Circuit did direct that the Court should determine- <u>after any appropriate fact finding</u> whether age and maturity applies. In this light, I don't think it can be honestly done.

The First Amendment's free exercise clause and the right of privacy are intertwined. There is a strong presumption in favor of the privacy of religious beliefs. Catherine adheres to a fundamental evangelical Christian belief. As

custodial parent, Catherine's beliefs are the religious beliefs of her son and are not subject to public scrutiny. Privacy underlies all religion clauses, and should carry just as much weight as genuinely held beliefs that one's religious faith prohibits testimony to nonbelievers. He should not be put in the position of choosing between his Mother and his Father. Furthermore, to ask the question, presumes that the religion of secular humanism supersedes her authority over her son as dictated by her deeply held religious beliefs.

There is no sufficiently compelling state interest to warrant forcing some, narrowly circumscribed, testimony from Andreas regarding age and maturity that would overrule Catherine's free exercise of religion as well as privacy.

In her concurring opinion in <u>Employment Division v. Smith</u>, Sandra Day O'Connor states that: "Under our established First Amendment jurisprudence, we have recognized that the freedom to act, unlike the freedom to believe, cannot be absolute." 494 U.S. 872 (1990), at 894.

Catherine's religious beliefs are absolute. Her son Andreas' beliefs are absolute. The Court does not have the authority to pose questions that would cast doubt on the religious authority of the parent.

DATED:    Honolulu, Hawaii, March 30, 2007.

_Paul A. Lynch_
PAUL A. LYNCH