Silva v. Pitts, 481 F.3d 1279 (10th Cir. 04/05/2007)

[1]     United States Court of Appeals for the Tenth Circuit

[2]     No. 06-7046

[3]     481 F.3d 1279, 2007.C10.0000521< http://www.versuslaw.com>

[4]     April 5, 2007

[5]     **S.L.V.M. CYNDIE DE SILVA, PETITIONER-APPELLANT,**
**v.**
**PAUL E. PITTS; SABRINA PITTS, RESPONDENTS-APPELLEES.**

[6]     APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF OKLAHOMA (D.C. No. 06-CV-004-W H).

[7]     Submitted on the briefs:*fn1 Cyndie de Silva, pro se.

[8]     Laura Haag McConnell, Russell Cook, Hartzog, Conger, Cason & Neville, Oklahoma City, Oklahoma, for Respondents-Appellees.

[9]     The opinion of the court was delivered by: Porfilio, Circuit Judge.

[10]    PUBLISH

[11]    Before PORFILIO, BALDOCK, and EBEL, Circuit Judges.

EXHIBIT "A"

[12]   Petitioner-appellant S.L.V.M. Cyndie de Silva appeals the judgment of the district court denying her Hague Convention petition for return of her son, Jonathan, to her custody in Canada and allowing him, instead, to remain with his father in Oklahoma pending a custody determination. After "review[ing] the district court's findings of fact for clear error and its conclusions regarding principles of domestic, foreign, and international law de novo," Shealy v. Shealy, 295 F.3d 1117, 1121 (10th Cir. 2002), we affirm.

[13]   I. BACKGROUND

[14]   The Hague Convention on the Civil Aspects of International Child Abduction (Hague Convention or Convention), 1988 WL 411501, T.I.A.S. No. 11,670, is implemented in the United States by the International Child Abduction Remedies Act (ICARA), 42 U.S.C. §§ 11601-11610. The Hague Convention was adopted to protect children from the adverse effects of being wrongfully removed to or retained in a foreign country and to establish procedures for their return. See Ohlander v. Larson, 114 F.3d 1531, 1534 (10th Cir. 1997). "The Convention is meant to provide for a child's prompt return once it has been established the child has been 'wrongfully removed' to or retained in any affiliated state." Id. (quoting Convention, art. 1).*fn2

[15]   The removal or retention of a child is wrongful where it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention, where such rights were actually exercised by the parent seeking return of the child. The petitioner bears the burden of showing by a preponderance of the evidence that the removal or retention was wrongful. More specifically, the petitioner must show that: (1) the child was habitually resident in a given state at the time of the removal or retention; (2) the removal or retention was in breach of petitioner's custody rights under the

laws of that state; and (3) petitioner was exercising those rights at the time of removal or retention.

[16]   Shealy, 295 F.3d at 1122 (quotation and citations omitted). We are concerned under the Hague Convention only with the merits of the retention claim, i.e., whether Mr. Pitts's retention of Jonathan in Oklahoma is wrongful. See id. at 1121. The question of which parent would be the better custodian for Jonathan is not before us. Id.

[17]   II. FACTS

[18]   Ms. de Silva and Mr. Pitts, who were never married, are the natural parents of Paul Jonathan de Silva Pitts, who was born in Ardmore, Oklahoma, on February 16, 1993. Ms. de Silva, who was in the United States on a student visa, registered Jonathan as a citizen of her native Sri Lanka within the first few months of his life.

[19]   Shortly after Jonathan's first birthday in February 1994, Ms. de Silva was notified by the Immigration and Naturalization Service that her visa had expired and that she was required to leave the United States by March 28, 1994. Ms. de Silva did not comply with this deadline. In May 1994, Mr. Pitts secured an order from the district court for Carter County, Oklahoma, enjoining either parent from removing Jonathan from that court's jurisdiction (ne exeat order). On July 5, 1994, and despite the Carter County ne exeat order of which she had notice, Ms. de Silva took Jonathan with her to Sri Lanka without Mr. Pitts's consent. Approximately one month later, the Carter County court awarded full custody of Jonathan to Mr. Pitts and, later that summer, held Ms. de Silva in contempt of the ne exeat order.

[20]   Mr. Pitts eventually reunited with his son on a visit to Sri Lanka, a

country which is not a signatory to the Hague Convention and could not provide Mr. Pitts an opportunity under the Convention to argue in the courts of that country that Ms. de Silva had wrongfully removed Jonathan from Oklahoma. See United States v. Amer, 110 F.3d 873, 881 (2d Cir. 1997). On one of his visits to Sri Lanka, Mr. Pitts was served with papers relative to a second custody proceeding in Sri Lanka filed by Ms. de Silva. After being advised that the Sri Lankan courts would never enforce the Oklahoma custody order and that Ms. de Silva would almost surely be awarded custody, Mr. Pitts decided to agree to her custody demands, reasoning that, if he did not, she would likely flee again with the child. In 1996, Ms. de Silva obtained an order from a Sri Lankan court awarding her custody of Jonathan.

[21] In January 2003, after living with her son for almost nine years in Sri Lanka, Ms. de Silva fled to Canada where she was accepted as a refugee. Jonathan joined her in Canada a few weeks later. The parents had kept in contact over the years, and Mr. Pitts knew that his son had relocated to Canada. Mr. Pitts visited Jonathan in Canada on a couple of occasions, and Jonathan traveled from Canada to visit his father in Oklahoma at least once before the summer of 2005. In 2005, Jonathan had a round-trip ticket for a summer visit to Oklahoma that provided for his return in August 2005 to Canada, where he was scheduled to attend an end-of-summer camp. Instead of returning to his mother in Canada, however, Jonathan expressed his desire to stay with his father in Oklahoma. Jonathan has remained in Oklahoma ever since with Mr. Pitts and his wife, respondent-appellee Sabrina Pitts.

[22] Ms. de Silva quickly objected to Jonathan's relocation to Oklahoma and petitioned a Canadian court to enforce the 1996 Sri Lankan custody order. She neither informed Mr. Pitts of this action, nor disclosed to the Canadian court the fact of the 1994 custody order from Oklahoma.

[23]  In response to Ms. de Silva's petition, the Canadian court entered an ex parte order making a preliminary finding that Ms. de Silva was entitled to custody of Jonathan, ordering the return of the child to her, and setting the custody matter for further hearing after Mr. Pitts received notice. After the Canadian order was served on Mr. Pitts, he filed a response in the Canadian court which eventually stayed its earlier ex parte order. Counsel has advised us the Canadian matter remains abated.

[24]  While the Canadian action was pending, Ms. de Silva filed a petition for return of child in the federal district court for the Eastern District of Oklahoma pursuant to 42 U.S.C. § 11603 of ICARA seeking the return of Jonathan to her in Canada so that the Canadian courts can determine the matter of custody.*fn3

[25]  Mr. Pitts filed an objection to the petition, informing the district court for the first time of the pre-existing Oklahoma order granting him custody of Jonathan.

[26]  The district court referred the case to a magistrate judge who conducted a hearing at which both parties were present and represented by counsel. With consent of counsel, the magistrate judge also carefully and considerately conducted an interview in chambers with Jonathan. Afterward, she concluded that he was sufficiently mature to justify taking his wishes into account in this matter.*fn4 After the parties reviewed the hearing transcripts and submitted proposed findings of fact and conclusions of law, the magistrate judge determined that Jonathan had been wrongfully abducted from Oklahoma when his mother took him to Sri Lanka in 1994 at a time when Oklahoma was his habitual residence, and that Jonathan wished to remain in Oklahoma with his father. The district court adopted the findings and recommendation of the magistrate judge to deny Ms. de Silva's ICARA petition, and she appeals.

[27]     On appeal, Ms. de Silva, now appearing pro se, argues that: 1) the United States (and specifically Oklahoma) was never Jonathan's habitual residence; 2) the Oklahoma custody order is stale and thus unenforceable; 3) the temporary order of the Canadian court should be accorded full faith and credit by the district court; 4) M r. Pitts has acquiesced in her full custody both in Sri Lanka and in Canada; and 5) M r. Pitts failed to show that Jonathan's return to Canada will harm Jonathan.*fn5 Ms. de Silva also weaves various arguments into her brief going to her belief that custody of Jonathan should properly be with her. As mentioned above, however, "[o]ur scope of inquiry under the Hague Convention is limited to the merits of the abduction claim. As such, the merits of the underlying dispute related to custody of [Jonathan] are not before us." Shealy, 295 F.3d at 1121 (quotation and citation omitted).

[28]     III. ANALYSIS

[29]     Although we affirm the conclusion of the district court that Jonathan should remain in Oklahoma while the custody matter is determined, we do so via a different analytical path and relying on a different emphasis than the district court.

[30]     Initially we note that it was incorrect for the district court to apply the principles of the Hague Convention to Ms. de Silva's 1994 removal of Jonathan to Sri Lanka. The regulations implemented by the United States Department of State to govern Hague Convention actions apply only when a child is "taken to another country party to the Convention." 22 C.F.R. § 94.7. "If a child is taken from a signatory country and is retained in a non-signatory country, it appears that there is no remedy under either [ICARA, 42 U.S.C. §§ 11601-11610] or the Hague Convention." Mezo v. Elmergawi, 855 F. Supp. 59, 63 (E.D.N.Y. 1994); see also United States v. Amer, 110 F.3d 873, 881 (2d Cir. 1997) (noting that the "requirement that both the 'left-behind' and the 'retaining' countries are signatories to

the Convention is also implicit in its very operation. Because the Convention functions solely through the designated Central Authorities in the respective states, and because only contracting parties will have designated such authorities, the Convention can operate only between two signatory states.").

[31] Thus, because Sri Lanka is not a signatory country, Mr. Pitts had no rights under the Convention to get a judicial determination that Ms. de Silva's 1994 removal of Jonathan to Sri Lanka was wrongful. See Moshen v. Mohsen, 715 F. Supp. 1063, 1065 (D. Wyo. 1989).

[32] The district court also placed too much reliance upon the 1994 Carter County court order awarding Mr. Pitts full custody of Jonathan. Article 17 of the Hague Convention provides:

[33] The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State [here the United States] shall not be ground for refusing to return a child under this Convention, but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention. 1988 WL 411501, art. 17.

[34] The rationale for article 17 "is to prevent abductors from being able to rely upon . . . a 'dead' decision taken prior to the removal but never put into effect."*fn6

[35] Shalit v. Coppe, 182 F.3d 1124, 1131 (9th Cir. 1999). Further, the legal analysis provided by the State Department when the Convention was presented to the United States Senate in 1986 for ratification states that: "the alleged wrongdoer may [not] rely upon a stale decree awarding him or her custody, the provisions of which have been derogated from subsequently by agreement or

acquiescence of the parties, to prevent the child's return under the Convention." 51 Fed. Reg. 10494-01 at 10504-05 (Mar. 26, 1986); see also Miller v. Miller, 240 F.3d 392, 399 (4th Cir. 2001) (noting that "upon establishment of Canada as the children's 'habitual residence,' the mere existence of the New York Order granting permanent custody of the children to [the father] was not itself a defense for wrongful removal" by the father to New York).

[36]   Under other circumstances, we might remand a case like this to the district court for further development of the issue of habitual residence without the distraction of the Carter County custody order clouding the analysis. If Canada were held to be Jonathan's habitual residence, the Carter County custody order, although first in time, would not have had priority. A custody determination from a child's state of habitual residence takes priority over a similar decision from the requested state, here the United States and specifically Oklahoma. Miller, 240 F.3d at 399. Further, an inquiry into whether Mr. Pitts had acquiesced in Ms. de Silva's custody of Jonathan, at least upon their relocation to Canada, might also have been appropriate on remand. Despite these issues, we do not find it necessary to remand this case because Jonathan's wishes provide an important alternative basis which can appropriately inform and support the district court's decision.

[37]   As an initial matter, Ms. de Silva, as the petitioner, was required to establish that Mr. Pitts's retention of Jonathan in Oklahoma was wrongful. To do that, she had to show by a preponderance of the evidence that Mr. Pitts retained Jonathan away from Jonathan's habitual residence. She was also required to show she was exercising her parental custodial rights at the time of the wrongful retention (or at least would have exercised those rights but for the wrongful retention) under the laws of the country of Jonathan's habitual residence. Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir. 1993).

[38]   Once a petitioner establishes that removal was wrongful, the child must be returned unless the respondent can establish a defense. Friedrich v. Friedrich, 78 F.3d 1060, 1067 (6th Cir. 1996). There are four defenses set out in the Convention, which are narrowly construed, Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir. 1995), and which are not relevant here. There is also a fifth consideration, left to the discretion of the judicial or administrative authority, which allows for refusal to order the return of a child where "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, 1988 WL 411501, art. 13.

[39]   Courts in signatory nations take violations of the Convention very seriously. In fact, even if a defense is established, a court still has discretion to order the return of the child if it would further the aim of the Convention which is to provide for the return of a wrongfully removed child.*fn7 Friedrich, 78 F.3d at 1067; see also Danaipour v. McLarey, 286 F.3d 1, 14 (1st Cir. 2002) (noting that "even if the conditions for an Article 13(b) [grave-risk] exception are met, the Hague Convention gives the court discretion to return the child to the country of habitual residence"); Miller, 240 F.3d at 402. On the other hand, "the very nature of these exceptions gives judges a discretion - and does not impose on them a duty - to refuse to return a child in certain circumstances." Pérez-Vera Report at 460, para. 113. Thus, even if Ms. de Silva had established that Mr. Pitts's retention of Jonathan was wrongful, and despite the usually strict construction accorded the Convention, there remains room in the proper case for the exercise of judicial discretion.

[40]   One of the primary areas in which a court may appropriately decide not to return a child occurs when a child of sufficient age and maturity objects to being returned to the country of habitual residence. The Convention provides in Article 13: "The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to

take account of its views." (emphasis added).

[41]  The Pérez-Vera Report expands on this idea:

[42]  [T]he Convention also provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their own interests. Of course, this provision could prove dangerous if it were applied by means of the direct questioning of young people who may admittedly have a clear grasp of the situation but who may also suffer serious psychological harm if they think they are being forced to choose between two parents. However, such a provision is absolutely necessary given the fact that the Convention applies, ratione personae, to all children under the age of sixteen; the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will. Moreover, as regards this particular point, all efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary. It seemed best to leave the application of this clause to the discretion of the competent authorities.

[43]  Pérez Vera Report at 433, para. 30 (emphasis added).*fn8

[44]  Although courts have construed this exception narrowly, see England v. England, 234 F.3d 268, 272 (5th Cir. 2000), "a court may refuse repatriation solely on the basis of a considered objection to returning by a sufficiently mature child." Blondin v. DuBois, 238 F.3d 153, 166 (2d Cir. 2001). A court must apply a stricter standard in considering a child's wishes when those wishes are the sole reason underlying a repatriation decision and not part

of some broader analysis. Id.

[45]   In applying the "age and maturity" exception, a court must not focus solely on the general goal of the Convention -- to protect children from the harmful effects of wrongful removal -- but must also carefully determine that the particular child "'has obtained an age and degree of maturity at which it is appropriate to take account of its views.'" Blondin v. DuBois, 189 F.3d 240, 247 (2d Cir. 1999) (quoting Convention, 1988 WL 411501, art. 13). The Convention contains no age limit for applying the exception, Blondin, 238 F.3d at 167; Raijmakers-Eghaghe v. Haro, 131 F. Supp. 2d 953, 957 (E.D. Mich. 2001), and if a court determines that the youngster's opinion is the product of undue influence, the child's wishes are not taken into account, In re Robinson, 983 F. Supp. 1339, 1343-44 (D. Colo. 1997).

[46]   Given the fact-intensive and idiosyncratic nature of the inquiry, decisions applying the age and maturity exception are understandably disparate. Compare Anderson v. Acree, 250 F. Supp. 2d 876, 883 (S.D. Ohio 2002) (considering views of an eight-year-old child who was composed, calmly and readily answered questions, pointed to New Zealand on a globe, and indicated her understanding of the difference between truth and falsehood and of her obligation to tell the truth) and Raijmakers-Eghaghe, 131 F. Supp. 2d at 957-58 (ordering limited discovery including psychological reports and in camera interview to gather enough information to pursue issue of eight-year-old child's wishes) with Tahan v. Duquette, 613 A.2d 486, 490 (N.J. Super. 1992) (holding, without discussion, that the maturity exception "simply does not apply to a nine-year-old child") and England, 234 F.3d at 272-73 (reversing district court that had taken a thirteen-year-old child's wishes into account where child had learning disabilities, had had four mothers in twelve years, had attention deficit disorder, took Ritalin, and was scared and confused).

[47]    In this case, the magistrate judge interviewed Jonathan in camera with her law clerk and the court reporter present, but without the parents or their counsel in attendance. Jonathan indicated that, while he has "a lot of friends up in Canada," R. Vol. III at 130, and gets along with his sister who lives there, he had also made friends in Ardmore where he is on the football team and the wrestling team, id. at 131. He described the Pitts's house in Ardmore as "really big" and "a great place" where he has a computer and everything he needs for school. Id. He indicated that he wanted to remain in Ardmore because he thought the school was better. Id. at 132. Jonathan and his father had discussed relocation on a prior visit, but Jonathan was undecided then about staying with his father. Id. at 134. By 2005, however, Jonathan said he felt more at home in Ardmore and wished to stay. Id.

[48]    As a result of her interview, the magistrate judge concluded:

[49]    This Court has also considered the [sic] Jonathan's expressed opinions as to his status in accordance with Article 13(b) of the Hague Convention. 42 U.S.C. § 11603(e)(2)(A). This Court observed Jonathan to be a bright, expressive child with a welldeveloped understanding of his situation and the positions of his parents. He has attained an age and degree of maturity to so consider his views. Unlike Petitioner [Ms. de Silva], this Court did not find Jonathan to be particularly swayed by lavish gifts and wealth in forming an opinion that the schools were better in Oklahoma, he enjoyed his friends and activities and his home. He is well-settled in his environment in Oklahoma and expressed his desire to remain in Oklahoma with Pitts without apparent adult indoctrination. Allowing him to remain with Pitts while an Oklahoma court determines custodial issues between his parents is in his best interests at this time.

[50]    R. Vol. I, doc. 16 at 15-16.

[51] While a father's largesse could naturally be a factor in a child's decision, our reading of the record suggests this was taken into consideration by the magistrate judge. Moreover, the fact Jonathan and his father have discussed relocation over a period of time, and that Jonathan returned to Canada during the period of those ongoing discussions, convince us that this was a considered decision on Jonathan's part and represents his honest wishes. We are also mindful of the magistrate judge's opportunity to observe Jonathan in person, and we accord great deference to the court's findings based on that experience. See Anderson v. City of Bessemer City, 470 U.S. 564, 575 (1985). Given the court's duty to consider Jonathan's best interest and to determine whether he was of sufficient age and maturity to weigh in on this matter, we find no error in the district court's ultimate conclusion that Jonathan should remain in Oklahoma while Oklahoma courts decide the custody matter. We hold that, under the unusual circumstances of this case, it is appropriate to refuse repatriation to Canada solely on the basis of Jonathan's desire to stay in Oklahoma.*fn9

[52] The judgment of the district court is AFFIRMED. Ms. de Silva's motion to expedite and facilitate return of minor to Canada is DENIED.

Opinion Footnotes

[53] *fn1 After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

[54] *fn2 The term "state" as used in the Convention refers to a

signatory country.

[55]  *fn3 Both Canada and the United States are signatories to the Hague Convention. Miller v. Miller, 240 F.3d 392, 395 n.1 (4th Cir. 2001).

[56]  *fn4 Ms. de Silva contends in her opening brief that she was given an inaccurate hearing transcript. When she raised this issue in the district court, the magistrate judge recommended that her motion for copies of the tapes and for other relief be denied and informed Ms. de Silva that failure to object to the magistrate judge's recommendation within ten days would preclude further review. Ms. de Silva failed to object to the recommendation of the magistrate judge, and the district court denied her motion. Because she did not object to the findings of the magistrate judge, her arguments regarding the accuracy of the hearing transcript and the other matters raised in her motion will not be considered by this court on appeal. Morales-Fernandez v. INS, 418 F.3d 1116, 1119 (10th Cir. 2005).

[57]  *fn5 Ms. de Silva's briefs are difficult to understand; her arguments are illogically presented and intellectually unfocused. Because Ms. de Silva appears here pro se, however, we have liberally construed her briefs, see Cummings v. Evans, 161 F.3d 610, 613 (10th Cir. 1998), and have tried to discern the kernel of the issues she wishes to present on appeal.

[58]  *fn6 The phrase "dead decision" has its genesis in the report of Professor Elisa Pérez-Vera, who "was the official Hague Conference reporter. Her Explanatory Report is recognized as the official history and commentary on the Convention. Pub.Notice 957, 51 Fed.Reg. at 10503." Feder v. Evans-Feder, 63 F.3d 217, 222 n.7 (3d Cir. 1995). The Pérez-Vera report, Actes et documents de la Quatorzième session, 6 au 25 octobre 1980, Tome III,

Enlèvement d'enfants, is available on the Internet at www.hilton-house.com/articles/Perez_rpt.txt.

[59]  *fn7 "[T]he return of the child is to some extent the basic principle of the Convention." Pérez-Vera Report at 432, para. 27. "[T]he basic purpose and function of the Hague Convention and ICARA [are to ensure that] the home country should make the custody determination whenever possible." Gaudin v. Remis, 415 F.3d 1028, 1035 (9th Cir. 2005).

[60]  *fn8 Jonathan was thirteen years old at the time of the district court hearing. He recently turned fourteen.

[61]  *fn9 Ms. de Silva's remaining issues are without merit. Even if the temporary order from the Canadian court were of a more permanent variety, courts of the United States are not required to recognize foreign judgments. Diorinou v. Mezitis, 237 F.3d 133, 140 (2d Cir. 2001). Contrary to Ms. de Silva's view, Mr. Pitts was not required to establish that returning Jonathan to Canada would cause Jonathan grave harm. While that defense was available to Mr. Pitts, he was not required to avail himself of it.

20070405

© 1992-2007 VersusLaw Inc.